J. Smith McMaster, Claimant, *v.* The State of New York.

Where, after a breach of a contract by one party, the other is permitted to perform the same in part and receives the contract-price for such part performance, this is not a waiver or a release on the part of the latter of his right to damages for the breach. He may refuse further performance or perform as far as he is permitted and then claim his damages.

Under and in pursuance of the act establishing the Buffalo State Asylum for the Insane (Chap. 378, Laws of 1870), plans and specifications were adopted for the construction of certain buildings, the exterior facing of the walls of which the plans provided should be of sandstone, the managers advertised for bids and entered into contracts on behalf of the state with the firm of L. J. P. & Co., by which that firm agreed to furnish and the state to take all the sandstone called for by the plans and specifications. The contractors were required to own or purchase quarries and lease or give control of them to the state. Three months subsequently the managers advertised for bids for cutting the stone. L. J. P. & Co. were again the lowest bidders and a contract was executed for the work. By this the managers reserved the right to make any change they should deem proper in the plans and specifications. After three of the buildings had been completed, according to the plans and contracts, the managers resolved to build the other buildings of brick, with sandstone trimmings. Of these six were so built. The contractors protested against the change, but furnished and cut the sandstone required, receiving the pay therefor at the prices fixed by the contracts. After their completion the contractors were notified to remove all the stone belonging to them from the grounds and the work was stopped, nothing having been done toward the erection of five of the buildings. Upon claim presented to the Board of Claims for damages for breach of the contracts *held*, that the reservation in the second contract could have no operation upon the first, but conceding it should be taken as controlling the construction of both contracts it did not authorize the change made; also, that the action of the contractors in furnishing the stone required by the changed plans was not a ratification of the breach of the contracts or a waiver of their claim for damages.

No time was specified in the contracts for the completion of the buildings; the contractors were bound to deliver the stone as rapidly as required for the construction, and by the cutting contract they were bound "to commence the work immediately and prosecute the same diligently to its completion." *Held*, that the state was not authorized to arrest and abandon performance for an indefinite period, but was bound to go on with the construction without unnecessary delay until all the buildings were completed, and that the abandonment of the work as to the five buildings entitled the contractors to damages; also, that they were not bound to make any offer or tender of performance.

After the Board of Claims had fixed the amount the contractors would have made as profits on the work, which was the difference between the contract-prices and the cost of performance, it deducted a sum "for the less time engaged and for release from the care and trouble, risk and responsibility attending the performance of the whole of said contract." *Held*, no error; and this although the sum deducted was, in a great measure, arbitrary and based upon no definite data.

Also, *held*, that the Board of Claims properly refused to allow interest on the amount found due from the time of filing the petition.

(Argued February 10, 1888; decided February 28, 1888.)

Appeal from award made by the Board of Claims on the 4th day of May, 1887, in favor of the claimant.

The claim herein was for damages by reason of the breach by the state of two contracts for work and materials for building the Buffalo State Asylum for the Insane.

The asylum was established by the act, chapter 378 of the Laws of 1870, in pursuance of which plans and specifications were duly made and adopted for the construction of a central or administration building, five male wards designated A, B, C, D and E, five female wards designated in the same way and certain out-buildings, consisting of a laundry, two barns and an ice-house. The plans provided that the exterior facing of the walls of all the buildings should be of brown sandstone. After the adoption of the plans and their approval by the proper state officers, the board of managers advertised for bids for furnishing the stone required for the exterior facing of the walls of all the buildings, and Linus Jones, Peck & Co., a firm, were the lowest bidders, and the furnishing contract was awarded to them, which was, thereafter, to wit, October 9, 1871, formally executed, the managers signing the same pursuant to the statutes, on behalf of the state. Afterward, in January, 1872, the managers advertised for bids for cutting the stone to be furnished under the prior contract, and the same persons in their firm name were again the lowest bidders, and the cutting contract was awarded to them, which was thereafter on the thirteenth day of January formally executed in the same way as the prior contract.

The firm, immediately after the execution of each contract, entered upon the performance of the same and continued to furnish and cut the stone under the contracts until the month of May, 1876, at which time the administration building and the male wards A and B had been completed according to the plans and contracts. On the twenty-fifth day of May the managers resolved to build the male and female wards C, D and E, of brick with sandstone trimmings and plans in accordance with this resolution were approved by the proper state officers, and thereafter the male wards C, D and E, and the out-buildings were so built. After the completion of these wards and of the out-buildings in November, 1877, the managers notified the firm to remove all the stone belonging to them from the asylum grounds, and after that date they were never permitted to furnish or cut any more stone, and the five female wards have never been built. In 1881 the firm assigned their claim against the state for damages on account of the breach of their contracts to the claimant who brought the same to a hearing before the Board of Claims. The Board then decided that the claim was barred by the statute of limitations, but that decision was reversed by this court. (103 N. Y. 547.) Upon the rehearing the Board found that the firm would have made in the further performance of the two contracts, if they had been permitted to perform and complete the same, as profits the sum of $105,200.42, which sum includes the profit they would have made by furnishing and cutting the stone for the male wards C, D and E, the female wards and the out-buildings. This sum was reached by estimating the additional stone and cutting which would have been required if the contracts had been fully performed, according to the plans, and by taking the difference between the contract prices and the cost of the stone and cutting.

After finding that the total amount of the profits of the firm would thus have been the sum of $105,200.42, the Board of Claims further found as follows: " That from the evidence the period of about five years was comprised in the construc-

tion of the main building and male wards, and the time of the contractors being substantially occupied with the care, trouble, risk and responsibility attending such work. That to have completed the female wards and out-buildings, about the like length of time would have been occupied, with the like care, trouble, risk and responsibility attending such completion of said work and contracts. That deducting from the aforesaid aggregate sum of profits of $105,200.42 for the less. time the said contractors would have been engaged, and for their release from the care, trouble, risk and responsibility that would have attended the full completion of said work and contracts, the aggregate sum of the profits which would have accrued to said firm of Linus Jones, Peck & Company, had said work and contracts been fully performed, would have been $75,000, and which sum would have been equitable and just." And as conclusions of law the Board found as follows: "That the claimant herein, as the assignee of the said firm of Linus Jones, Peck & Company, is entitled to have and recover damages against said state upon his claim herein, for the difference between the cost to said firm for furnishing all the stone and the cost of cutting all such stone, and the prices for which said firm were to receive for said stone and said cutting, under and in pursuance of the aforesaid contracts, making reasonable deduction for the less time engaged, and for release from the care and trouble, risk and responsibility attending the performance of the whole of said contracts. That upon the foregoing facts and conclusions the claimant herein is justly and equitably entitled to damages in the sum of $75,000, which sum would be just and equitable." From the award as made the state appealed, in its notice of appeal assailing the sum on several grounds. The claimant also appealed, complaining in his notice of appeal of the reduction of the aggregate profits found by the board to the sum of $75,000, and also of the disallowance of interest upon his damages.

The further material facts are stated in the opinion.

*J. F. Parkhurst* for claimant.    The clause in contract B, authorizing the managers to change the plans, etc., did not authorize them to change from stone to brick, or reduce the number of the buildings, and such change was a breach of the contracts. (*Clark* v. *Mayor, etc.*, 4 N. Y. 338; *Danolds* v. *State*, 84 id. 36.)    The legal presumption is that the legislature, when it made the appropriations, was advised of and knew the situation. (*Brown* v. *Mayor, etc.*, 63 N. Y. 244; *People* v. *Flannigan*, 63 id. 242, 243; *People* v. *Supervisors*, 68 id. 118, 119; *People* v. *Stevens*, 71 id. 527.)    The contractors did not waive or release their claim for damages. (*Danolds' Case*, 89 N. Y. 45; Jacob's Law Dict., "Waiver;" Bouv. Law Dict., "Waiver;" *Hoxie* v. *Home Ins. Co.*, 32 Conn. 40; *Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 164; *Ross* v. *Swan*, 7 Lea, 467; Winfield's Words "Title," "Waiver;" *Johnson* v. *Gale*, 19 La. An. 212; *Fallin* v. *Lawler*, 102 N. Y. 228; *McCormick* v. *Dunlap*, 5 id. 537, 544; *McCormick* v. *Penn. Cen. R. R. Co.*, 80 id. 362; *Cassidy* v. *Le Fevre*, 45 id. 565; *Hancock* v. *Palmer*, 17 Abb. 335; *McMaster* v. *State*, 103 N. Y. 552.)

*Esek Cowen* for claimant.    The decision of the Board of Claims by which they deducted from the damages, which they found the contractors had actually sustained, the arbitrary sum of $30,000, because the contractors had devoted less time to the work and were released from care and responsibility, cannot be supported upon principle or authority. (*Costigan* v. *M. & H. R. R. Co.*, 2 Denio, 609; *Heine* v. *Wolf*, 1 E. D. Smith, 70; *Danolds* v. *State*, 89 N. Y. 47; *U. S.* v. *Speed*, 8 Wall. 77; *Masterson* v. *Mayor, etc.*, 7 Hill, 61, 71, 73; *Bagley* v. *Smith*, 10 N. Y. 499.)    The Board of Claims erred in not allowing the claimant interest on the amount found due him, at least from the date of filing the petition. (*McCollum* v. *Seward*, 62 N. Y. 316; *Dana* v. *Fiedler*, 12 id. 40; *White* v. *Miller*, 71 id. 118; 78 id. 393.)

*Charles F. Tabor*, attorney-general, and *Denis O'Brien* for the state.    The change from stone to brick in the three

male wards, C, D and E, did not constitute a breach of the contract on the part of the state, or give the claimant a right of action for damages. (2 Parson's on Cont. [7th ed.], 501, 503 ; 67 N. Y. 338 ; 52 id. 131.) The contractors, by their own conduct in furnishing stone for the trimming, and cutting the same, and receiving pay therefor under the contracts, practically construed them as authorizing the change by the state and waived on their part any claim for damages by reason of such change. (*Lawrence* v. *Dale*, 3 John. Ch. 23 ; *Meehan* v. *Williams*, 2 Daly, 376 ; *Swain* v. *Seamans*, 9 Wall. 254 ; *Allen* v. *Robinson*, 2 Barb. 341 ; *Baird* v. *Mayor, etc.*, 74 N. Y. 386 ; *Bryce* v. *City of Cohoes*, 67 id. 206 ; *Ireland* v. *Nichols*, 46 id. 413 ; *Smith* v. *Alker*, 102 id. 90 ; *Fallon* v. *Lawler*, id. 228 ; *Gallagher* v. *Nichols*, 60 id. 448 : *Hadden* v. *Coleman*, 73 id. 568 ; *Cutter* v. *Mayor, etc.*, 92 id. 170 ; Bigelow on Estop., 562, 568, 574.) The omission on the part of the state to construct the five female wards does not constitute a legal basis for damages. (Const., art. 8, § 8 ; *Lawson* v. *Hogan*, 93 N. Y. 39 ; *Jones and Brown's Case*, 1 Ct. Claims, 383 ; *Deming's Case*, id. 190 ; *Wilson's Case*, 11 id. 513.) The notice of the managers to the contractors to remove stone from the premises was not a breach of the contract. (*Martin* v. *Farnsworth*, 49 N. Y. 558 ; *Walsh* v. *Hartford Fire Ins. Co.*, 73 id. 10 ; *Ritch* v. *Smith*, 82 id. 629.) In an action for breach of a contract, the burden of proof is always upon the plaintiff. (*Berry* v. *Brown*, 12 N. Y., 15.) A judgment concludes the parties only as to the grounds covered by it and the facts necessary to uphold it ; and though a decree in express terms professes to affirm a particular fact, yet if such fact was immaterial and the controversy did not turn upon it, the decree will not conclude the parties in reference to that fact. (*People* v. *Johnson*, 38 N. Y. 63 ; *Palmer* v. *Hussey*, 87 id. 303 ; *Perry* v. *Dickerson*, 85 id. 345 ; *Jarvis* v. *Driggs*, 69 id. 143.) The claimant herein would not be estopped from disproving any allegation contained in the complaint in the former suit against the state, the truth of which was not

involved, assuming that the complaint did contain any allega-
tion inconsistent with the position of the appellant in this
action. (*Sweet* v. *Tuttle*, 14 N. Y. 465; *Weed* v. *Burt*, 78
id. 191; *Reynolds* v. *Garner*, 66 Barb. 310; *Jackson* v.
*Andrews*, 98 N. Y. 672; *Lorillard* v. *Clyde*, 99 id. 196;
*Zoeller* v. *Riley*, 100 id. 102.) The board did not err in
refusing to allow the claimant interest upon the amount of
damages from January 1, 1882. (*Pres. R. G. F.* v. *Reid*, 5
Cow. 587; *Robinson* v. *Stewart*, 10 N. Y. 197; *Day* v. *N.
Y. C. R. R. Co.*, 22 Hun, 418; affirmed, 89 N. Y. 616;
*White* v. *Miller*, 78 id. 393; *Smith* v. *Velie*, 60 id. 107;
*McMahon* v. *N. Y. & E. R. R. Co.* 20 id. 463; *U. S.* v. *Sher-
man*, 8 Otto, 565; Laws of 1876, Chap. 444; *Lewis* v. *State*,
96 N. Y. 71.)

EARL, J. There is no contention on the part of the state
that the award in this case is excessive, provided it is free
from the objections which it makes thereto. Its claim is that
there was no liability whatever on its part for any of the
damages embraced in the award. It will conduce to perspi-
cuity and brevity to consider the various objections under
separate heads.

(1.) The furnishing contract required the contractors to
furnish the stone of the quality known as hard sandstone for
the exterior facings of the walls of the asylum buildings, and
the cutting contract required them to cut such stone. The
contracts contain no description of the buildings, and there is
nothing in either of them specifying that the whole exterior
facings of the walls were to be of sandstone, and hence it is
contended that there was no breach of the contracts in the
construction of the walls of some of the buildings of brick
with sandstone trimmings. But it is fairly to be inferred
from the language of the furnishing contract that the facings
of the walls were to be of sandstone. The contractors were
to furnish all such stone required and necessary for the con-
struction of the buildings. The stone was to come from
quarries in Orleans county, and the contractors agreed to lease

the quarries to the state to an amount in quantity sufficient for the completion of the buildings, and authorized the state to take possession of the same for the purpose of quarrying and delivering the stone, in case of default on their part to perform their contracts. While the plans and specifications do not appear in the record, they must have been put in evidence, as it appears to have been assumed on the trial that they did require all the walls to be built with sandstone facings, and such is the inference from all the facts in the case. The resolution of May 25, 1876, changing the plans of wards C, D and E, on both sides of the asylum building, permitted those wards "to be constructed of brick with sandstone trimmings instead of stone entirely," and modified the previous plans accordingly. There was no objection or exception that pointed to the absence of the fundamental proof that the original plans required the exterior facings of all the walls to be constructed of sandstone. On the contrary, the requests to find submitted to the Board of Claims on behalf of the state assumed that the original plans required sandstone, and that there was a change from stone to brick, and when on the argument before us the original plans and specifications were produced, and it was asserted by the counsel for the claimant that they did so require, the counsel for the state made no denial. Therefore the finding of the Board that the original plans required sandstone facings for the walls of all the asylum buildings, and the conclusions based thereon cannot be assailed here.

(2.) In answer to the claim for damages on account of the change from stone facings to brick with stone trimmings, it is said by the learned counsel for the state that such change was authorized by the contracts, and that it was not, therefore, a breach thereof. It is not pretended that there is anything in the terms of the furnishing contract authorizing such a change. According to that contract the contractors were bound to furnish and the state was bound to take from them all the sandstone required for the completion of the buildings according to the plans and specifications. But the cutting

contract, made three months later, contained this clause: "The party of the second part reserves the right to make any change they shall deem proper in the plans and specifications of said buildings, and the work shall be performed by the party of the first part in accordance, for the prices and compensation above set forth, unless such change shall increase the expense of doing said work, in which case the party of the first part shall be paid a reasonable compensation therefor, to be certified by the supervising architect and superintendent." It is claimed on the part of the state that the two contracts must be read and construed together, and hence that this clause must have operation in the construction of both contracts, and that it authorized the change from stone to brick facings. But we do not perceive how this clause can be held to have any operation upon the first contract. It does not appear that there was any actual intention to make such an important change in that contract, and the parties were not dealing with that contract. There was no consideration or inducement to the contractors to consent to such a change. The second contract was awarded to them after competative bids and they obtained it from the mere accident that they were the lowest bidders. It might have been awarded to some other party, and then no one would have contended that the clause quoted could have had any operation in the construction of the prior contract. The clause is a mere reservation to the state of rights which the contractors would otherwise have under the second contract, and it takes nothing from what they had or were entitled to under the first contract. It is something taken out of the general scope of the second contract, and can have no other effect. It is true that there is a general rule that written instruments executed at the same time, or about the same time, between the same parties and relating to the same subject-matter, may, for the purposes of construction and interpretation, and to arrive at the intention of the parties be read together. (Greenlf. on Ev. §§ 277, 283; 2 Pars. on Cont. [7th ed.] 501, 503; *Wilson* v. *Randall,* 67 N. Y. 338.) But here these

instruments were not executed at the same time, but three months apart.   They do not relate to the same subject-matter. The one relates to material to be furnished, and the other to work to be done, and they were not voluntarily executed after negotiations as to their terms and provisions.   But they were awarded after competative bidding and came to the contractors by operation of law simply because they were the lowest bidders.   Under such circumstances the rule above referred to can have no operation.

But if we should suppose that the rule could have operation and that this clause must be taken as controlling the construction of both contracts, as it certainly must be taken as controlling the construction of the contract in which it was inserted, yet we are of opinion that it cannot have the effect claimed for it and that it did not authorize the change made. What change did the state reserve the right to make?   It certainly had no right to omit entirely the construction of all or any of the buildings.   The asylum buildings referred to in the contracts were the central or administration building, the five connecting wards on each side and the out-buildings. These were all to be built.   The size and height of them were fixed and the material to be put in the walls was determined.   The general character of the buildings could not be changed so that the buildings would not be the same contracted for; if it could be, then a public letting in such a case would not be a useful and might be an idle ceremony.   Under such a reservation could a building planned for five stories be reduced to two?   Could a stone building let to a stone mason be changed to wood or brick?   Could the five connecting wards be reduced to two or three or fonr?   We are clear that authority for such extensive changes could not be found in such language.   If the state could change to brick walls with sandstone trimmings, then it could change to walls made wholly of brick, and thus there would be no stone to cut and the cutting contract would be entirely nullified.   It is difficult, probably impossible, to draw in advance a precise line between what is authorized by such a reservation and what is

not. It authorizes such changes as frequently occur in the process of constructing buildings, in matters of taste, arrangements and details; but it does not authorize a change in the general character of the building. If it does, a contract carefully entered into could be mainly if not entirely frustrated.

The construction we have thus given is fortified rather than weakened by construing both contracts together, as the learned counsel for the state claims they should be. Under the first contract the contractors were required to own or purchase quarries and lease them or give the control of them to the state, and thus they were required to make considerable investments for the purpose of being able to furnish the stone. Can it be supposed, under such circumstances, that the parties intended by the reservation in the second contract to authorize at the will of the state any change that might substantially destroy the furnishing contract? Would buildings with a few superficial feet of sandstone facings be the building in reference to which the competitive bidding was invited and the contracts were let? We think not, and that the contracts were broken by change from sandstone to brick.

(3.) After the resolution of May 25, 1876, under which the change from sandstone to brick with sandstone trimmings was made, the contractors furnished and cut the sandstone for the trimmings and received pay therefor in full under the contracts, and therefore the state contends that they practically construed the contracts as authorizing the change and that their conduct constituted a waiver of any claim for damages by reason of such change. If the contractors had in any way induced the change or if they had taken any advantage therefrom, or if their conduct had thereafter imposed any loss upon the state there might have been some reason for the contention now made. But it does not appear that they knew that the change was contemplated until it was irrevocably accomplished, and if they had known it they could not have prevented it. They furnished and cut the stone for the trimmings under their contracts, and this they had the right to do. They could perform their contracts so far as they were able, without

waiving anything or ratifying the breach thereof. They received no benefit from this part performance, as they got only the contract prices for the stone thus furnished and cut, and whatever benefit that gave them they were entitled to under their contracts. They imposed no loss upon the state as it was bound to pay them all the profit they made upon the stone trimmings, either as compensation under the contracts or as damages for the breach thereof. The contention that, where there is a breach of contract by one party and the other thereafter is permitted to perform the same in part, receiving the contract price for such part performance, the injured party thereby waives or releases his right to damages for the breach, has no foundation in reason or authority. It is undoubtedly the rule that where one party to a contract breaks the same, the other party may stop and refuse further performance. But instead of doing so he may perform so far as he is permitted and then claim the damages he has suffered from the breach. Here the contractors furnished and cut the stone for the trimmings, not under a new contract, but under and in performance of their original contracts and for the prices therein mentioned, and this they could do without any ratification of the modification of the contracts attempted by the state.

But here there was not silent acquiescence in the change. The contractors did not in any way assent thereto, and the finding that they protested against the same has some support in the evidence. A finding that they condoned a serious violation of their rights and effectually released and waived a large claim of damages should have something substantial to rest upon.

(4.) The plan of the out-buildings was also changed from sandstone facings to brick with sandstone trimmings, and they were built upon the changed plan. There does not appear to have been any formal resolution making this change. But it was nevertheless made by the representatives of the state at the same time with the change in wards C, D and E, and as part of the same scheme for the completion of the asylum

buildings. The contractors furnished the sandstone trimmings for the out-buildings and were paid therefor the contract prices. They could not prevent the change and did not assent to it. What we have said about the change in the wards applies to changes in the out-buildings, and the claim for damages on account of the breach of the contracts in reference to them has not been effectually answered.

(5.) The largest portion of the award made to the claimant is founded upon the omission of the state to construct the five female wards. The refusal of the state to build them, and to allow the contractors to furnish and cut the stone for them constituted a breach of the contracts which made it liable for damages. The contractors in no way assented to this breach. They were ready, willing and able to perform the contracts on their part. It is true that no time is specified in the contracts for the construction or completion of the buildings. The contractors were bound in terms to furnish and deliver the stone from time to time as rapidly as they might be required for the construction of the buildings, and the state was bound to make them monthly payments; and by the cutting contract they were bound " to commence the work immediately and prosecute the same diligently to its completion." At the time the contracts were let the state had inaugurated a scheme for the immediate construction of the asylum buildings and had appropriated money for that purpose, and it was evidently the expectation of all parties that the work of construction would at once be commenced and carried to completion without unnecessary delay. The contractors were clearly bound to commence performance on their part and to continue to final performance, and it would be quite unreasonable to hold that while they were at all times bound to be ready and able to perform, the state was at liberty at any time for an indefinite period to arrest and abandon performance which might again be resumed at its pleasure. We think after entering into these contracts and commencing the work, the state was bound to go on with the construction of the buildings without unnecessary delay, and to carry the enterprise to completion within a

reasonable time. (*Clark* v. *Mayor, etc.*, 4 N. Y. 338; *Danolds* v. *The State*, 89 id. 36; *United States* v. *Smith*, 94 U. S. 214; *United States* v. *Mueller*, 113 id. 153.)

The state was bound by its contracts just as an individual would have been bound. It might violate them, but could not repudiate or destroy the obligation of them. It was bound through its legislature to make the necessary appropriation of money for them, and to do whatever was necessary for performance on its part. The contractors did not, in entering into the contracts, take the chances that the legislature would pass the acts requisite for performance on the part of the state; but they had the right to expect and demand performance on the part of the state as if it were an individual. Now, what did the state do? After the central building, the five male wards and the out-buildings were completed, and while the contractors were there with their material ready to continue performance on their part, the managers representing the state, by resolution, on the 5th day of November, 1877, ordered them to remove all their stone from the asylum grounds within ten days. The stone referred to, or at least some of them, may be presumed to have been delivered there for the performance of their contracts. The order was peremptory to remove *all* their stone, and thereafter they were not permitted to furnish or cut any more stone, and the five female wards have never been constructed, and the legislature has never appropriated any money for their construction. We think the contractors had the right to regard the contracts as broken as to the female wards, and they were not bound to make any offer or tender of performance. The resolution of the managers was equivalent to a positive command to cease further performance on their part. It is clear that an offer of performance on their part after that would have been fruitless, as the managers, without a legislative appropriation, were powerless to perform.

We are, therefore, of opinion that the award is not open to any of the assaults made upon it on behalf of the state, and that its appeal should fail.

We will now proceed to examine the questions raised by the claimant's appeal.

(6.) After the Board of Claims had determined that the contractors would have made as profits from the performance of the two contracts the sum of $105,200.42, computed as stated in the findings of facts, they deducted from that sum $30,200.42, and awarded the sum of $75,000 as the aggregate profits which would have accrued to the contractors from the performance of the two contracts. The larger sum was reached by taking the difference between the contract-prices and the estimated cost of the stone and cutting, and was the result of a mathematical calculation based upon data furnished by the witnesses. The general statement of the rule of damages in such cases is the difference between the contract-price and the cost of performance, and in the case of contracts requiring for their performance a few acts and a brief period of time the rule is not difficult of application and will generally produce results sufficiently certain for the purposes of justice. But in the case of contracts requiring for their performance many acts and a series of years, the application of the rule is attended with more uncertainty and the question of damages becomes a complex problem not so easily solved. In such cases accidents and contingencies may and usually will intervene to vary results. Here the Board of Claims were dealing with contracts which would take several years for their performance. The contractors were required to take the stone from quarries in Orleans county and transport them about 100 miles to the asylum grounds in Buffalo, and then cut them ready for the buildings. Capital, machinery and implements had to be supplied and kept for the performance, and during the five years there would be many contingencies and accidents to vary results and probably to detract from profits. In the estimation of damages for the breach of such contracts all these matters ought to be considered. In fixing the gross sum, however, we must assume that they were not allowed their proper influence. So, too, in estimating profits from the performance of such contracts requiring the labor,

skill, supervision and care of the contractors, some allowance should be made for their time, and some deduction from gross profits should be made for that.    By the breach of these contracts these three contractors were released from their performance and were set at liberty to employ their time in other enterprises.    It cannot be assumed that they and their machinery and implements remained idle for the whole five years.    That would be against all probability.    It was worth something to them to have the control of their time for other business, and this, as we must infer, was not considered in fixing the gross amount of profits and for all these matters the board, before reaching its final conclusion as to the damages, made an allowance of a little over $30,000, and the sum of $75,000 represents their final judgment upon all the facts. In reaching the allowance or deduction of $30,000 for the care, labor, trouble, risk and responsibility which would have attended the performance of these contracts, we cannot say that the board erred.    It is true that that sum is, in great measure, arbitrary and based upon no definite data.    But it is as certain as any amount which may be taken as profits upon such contracts requiring years for their performance with all the risks, uncertainties and contingencies which must ordinarily attend such performance.    The following cases are sufficient authority for the action of the board in determining the amount finally awarded.    (*Masterton* v. *Mayor, etc.*, 7 Hill, 61 ; *Danolds* v. *State, supra; United States* v. *Speed*, 8 Wall. 77.)

(7.) The claimant contends that the Board of Claims erred in not allowing him interest upon the amount found due from the date of filing his petition against the state.    If this had been a common law action against an individual to recover damages for breach of contracts under precisely the same conditions, we are of opinion that interest could not legally have been allowed to the plaintiff, even from the commencement of the action.    The claim is in every sense unliquidated. There was no possible way for the state to adjust the same and ascertain the amount which it was liable to pay, and hence within the decision of *White* v. *Miller* (71 N. Y. 118, 78 id.

.393), it was not liable for interest. The law in reference to the allowance of interest is not in a very satisfactory condition, but it is believed that no decision in this court has yet gone the length of allowing interest in such a case. It is scarcely claimed in this case that there could be any allowance of interest for the period of time prior to the filing of the petition, which may be regarded as equivalent to the commencement of an action; and in the case cited it was held that where the claim was such that it could not draw interest before the commencement of an action that event would not set the interest running.

We have therefore come to the conclusion upon the whole case that neither appeal should prevail, and the award should be affirmed without costs to either party.

All concur, except DANFORTH. J., dissenting, and GRAY, J., who dissents as to interest.

Award affirmed.