Leroy W. Parker, assignee of Henry I. Glowacki, rendered his final account, and objections thereto were filed by the National Bank of Genesee. Some of the objections were sustained, and the assignee appealed.

Argued before BARKER, P J., and DWIGHT and MACOMBER, JJ.

*Leroy Parker,* pro se. *H. F. Tarbox,* for respondents.

DWIGHT, J.   We concur with the learned county judge in all the conclusions reached by him upon this accounting, with a single exception; and we refer to his opinion for the grounds of those conclusions.   The finding in which we do not fully concur is that by which, in effect, the assignee is charged with overpayment to the preferred creditor by the amount of certain payments by the assignor for real estate conveyed to his wife, who was the creditor preferred by the assignment.   The sole question in the case was as to the amount of the indebtedness of the assignor to his wife; and the county judge reduced that amount by the payments mentioned.   Among them was the payment of $1,580 for the "Home Place," in Batavia, which was bought by the assignor and the conveyance taken to his wife.   The first of the indebtedness of the husband to the wife grew out of the receipt by him, as her agent or trustee, of the proceeds of the sales of lands which had been conveyed to her by her father.   These sales began, and the first money of his wife was received by the assignor, in 1851, whereas the purchase by him of the "Home Place" in Batavia was in the year 1849.   At this time, so far as appears, the assignor was not indebted to anybody, and the purchase price of this piece of land was paid by him, with his own money, at a time when he was at liberty to make a gift to his wife, discharged of any claim of creditors.   In view of these facts, which seem to be undisputed, we think the county judge fell into an inadvertence in treating this sum of $1,580 as applicable in reduction of the subsequent debt of the husband to the wife.   The sum in question is included in an item of $1,807.50 "by cash paid for real estate" on the credit side of the account between the husband and wife, as stated by the county judge in Schedule A, attached to his findings.   It is objected that no exception was taken by the assignee to this allowance of credit.   But it is to be observed that the finding of fact in respect to the indebtedness of the assignor to his wife is general, consisting only of a statement of the balance found to be due at the date of the assignment, and this finding is duly excepted to.   The statement of items of debit and credit is contained in a schedule only, and was not subject to exception.   We think the judgment or decree appealed from should be modified by deducting from the amount with which the assignee is charged as remaining in his hands the above sum of $1,580, and that as so modified it should be affirmed, without costs of this appeal to either party.   All concur.   So ordered.

---

PEOPLE *ex rel.* PECK *v.* BUFFALO STATE ASYLUM.

(*Supreme Court, General Term, Fifth Department.* December 30, 1889.)

1. MANDAMUS—TO CERTIFY CLAIMS AGAINST THE STATE.
    A contract under Laws N. Y. 1870, c. 378, for the erection of necessary buildings by which the board of managers of the Buffalo State Asylum agrees to estimate and measure all work done and materials furnished by plaintiff, and pay monthly a specified percentage on the estimate of the superintendent of the quantity delivered the preceding month, and the remaining percentage after the materials are laid in the buildings, and measured and accepted by the supervising architect, imposes on the board an official duty to adjust, estimate, and certify the amounts due plaintiff, performance of which will be enforced by *mandamus.*

2. SAME—FAILURE OF APPROPRIATIONS.
    The fact that the appropriations made by the state to pay for the buildings have been exhausted is no answer to a proceeding to compel defendant to ascertain and

certify the amount due plaintiff for work on the buildings, as it is to be presumed that the state will make provision for payment on the production of the requisite evidence of the claim.

Appeal from judgment on report of referee.

Proceeding by writ of *mandamus*, sued out by Linus Jones Peck *et al.* against the board of managers of the Buffalo State Asylum for the Insane, to compel the board to adjust, determine, and certify the amounts due plaintiffs for material furnished and work done by them under contract. From a judgment on report of referee, entered in Erie county, defendants appeal.

Argued before BARKER, P. J., and DWIGHT and MACOMBER, JJ.

*S. Clinton,* for appellants. *E. A. Nash,* for respondents.

DWIGHT, J. The proceeding was instituted by a writ of alternative *mandamus,* directed to the defendants, requiring them to adjust and determine, and thereupon to certify, the several amounts remaining due to the relators on account of the several kinds of material furnished and work done by them under two several contracts made with them by the defendants. The contracts were of dates, respectively, October, 1871, and January, 1872, and were executed by the defendants under the authority of chapter 378 of the Laws of 1870, which established the Buffalo State Asylum for the Insane, constituted the board of managers thereof, and authorized such board to contract for the erection of the buildings necessary for its use. We do not understand that the validity of the contracts actually made with the relators is questioned on this appeal, nor the binding force, at the time of their execution, of those provisions of the contracts which the relators invoke as the ground of this proceeding. A large portion of the argument for the appellants is in support of the proposition that subsequent legislation, notably the acts of 1874 (chapter 323) and 1875, (chapter 264,) had the effect to deprive the board of managers of the authority conferred, and relieved them from the duties imposed by the act of 1870. We regard this contention as disposed of by the cases of *McMaster* v. *State,* 4 N. Y. St. Rep. 272, and *Same* v. *Same,* 108 N. Y. 542, 15 N. E. Rep. 417, in which not only was the validity and binding force of the contracts in question fully affirmed, but it was also held that they were neither abrogated nor interfered with by the subsequent legislation referred to. See opinion of EARL, J., in the former case, at pages 274, 275. Such being the character and force of those contracts, it follows that every obligation assumed thereby on the part of the defendants, as officers and agents of the state, are as much a matter of official duty as if prescribed and defined by the statute under which the contracts were made; and the question is whether the contracts themselves impose upon the defendants the duty, the performance of which is sought to be enforced by this proceeding. We quote below the provisions of the two contracts relative to the ascertainment of the amounts of work done and material furnished by the relators, and for which they were entitled to be paid. The first of the two contracts was for furnishing all the stone required for the exterior facing of the walls of the building to be erected, under the descriptions of "irregular block work" and "dimension stone." The former was to be paid for at 30 cents per superficial foot, measured on the face of the wall; "seventy-five per cent. of the price thereof to be paid monthly, upon the estimate of the supervising architect or superintendent, of the quantity delivered the month preceding such estimate, and the remaining twenty-five per cent. thereof monthly, after the same shall have been laid in the wall, and measured and accepted by the supervising architect and superintendent of said buildings." Dimension stone was to be paid for at 75 cents per cubic foot, "to be measured by the supervising architect or superintendent, and paid for at the end of each month after the same shall have been delivered upon said grounds and approved and accepted by the supervising architect and superintendent." And the contract contained the

further provision: "The party of the first part [the board of managers] hereby covenant and agree with the party of the second part to estimate and measure all stone delivered, monthly, after the delivery thereof as aforesaid, and to pay for the same in accordance with the provisions of this contract hereinbefore mentioned." The second contract was for the cutting of all the stone, of every description, for the exterior facing of the walls, under the several descriptions of "irregular rock-faced block work, chisel dressed work, moulded work, and carved work," at prices specified for each; and it contained this provision: "The party of the second part [the board of managers] further agrees to cause monthly estimates of said work to be made at the end of each current month, by the supervising architect and superintendent, of all work done or completed during the month, and to pay to the party of the second part ninety per cent. of the amount of such monthly estimate on the first of the ensuing month; and they further agree to have said work measured in the wall, or so much thereof as shall be laid monthly, at the end of each current month as the work progresses, by the supervising architect and superintendent; and on the first of the succeeding month to pay the party of the first part in full for the work so laid and measured, less the said ninety per cent. that shall have been paid upon the monthly estimate for the same work, to the end that there may be final settlements, monthly, of the work as it progresses until its completion."

Here, then, is the provision in both of the contracts that the board of managers shall cause all the material furnished and work done by the relators to be estimated and measured by the supervising architect and superintendent, monthly, and to pay for the same, monthly, viz., a specified percentage on the estimate, and the remaining percentage on the measurement in the wall of all such material and work. Probably the presumption would obtain that such estimates and measurements were in all cases duly made and certified to the board of managers by the supervising architect and superintendent; but, whether so or not, the proof shows, and the referee has found, that with the single exception of one item, viz., of 1,998 cubic feet of dimension stone furnished by the relators, in addition to the much larger amount which had been delivered and paid for, such estimates and measurements were in fact made and reported to the board of managers; and in respect to the items excepted it is found that the stone embraced in it was "accepted by the superintendent and supervising architect, and used by the said board of managers in the construction of said buildings." No part of the evidence taken by the referee is reproduced in the record on this appeal, but the facts are summarized as matters which the relators gave evidence tending to prove. No objection was made to the reception of such evidence; no evidence was offered to controvert it in any particular; and the findings of fact of the referee are a transcript of the summary of the evidence thus received. The case is therefore presented to us as if the defendants had stipulated or conceded all the facts embraced in the findings of the referee. Those findings embrace statements in detail of the measurements of all the stone furnished and cutting done by the relators month by month; all of which (with the exception before noted) were measured and accepted by the supervising architect and superintendent, and reported to the board of managers, and of the several amounts paid and reserved on each. It is further found in respect to each of the various classes of material furnished and work done (with the exception above noted of 1,998 feet of dimension stone delivered, and an item of 1,250 superficial feet, girt measure, of mouldings cut) that the board of managers caused vouchers for all such measurements to be made and delivered to the relators, upon which payments were obtained by them, and the vouchers were thereupon returned to the board of managers. There is also the further finding "that said measurements of irregular blocks delivered by Linus Jones Peck & Co., and of dimension stone, irregular blocks, and mouldings cut by them, were in

each instance measured by the superintendent and supervising architect, and the amount and quantity adjusted by them and said board of managers without the knowledge or co-operation of the said Linus Jones Peck & Co., or any one on their behalf; that the first information the said company, or any member of said firm, had of the quantity of stone delivered or of work done and performed, and which had been accepted and measured, was that furnished to them by the said vouchers delivered to said company by the board of managers, upon which partial payments were made; also that said Linus Jones Peck & Co. have not at any time had any means of showing the quantity of irregular blocks delivered, and the amount of work of cutting dimension stone, irregular blocks, and mouldings, performed by said company, which had been accepted and measured, and for which the said company was entitled to pay under said contracts, except by said vouchers so delivered to them by said board of managers, and in each instance, after the payment was made thereon, the said voucher was returned by said company to said board of managers. By these findings, which, though formally excepted to in a body, are, word for word, supported by unquestioned evidence, none of which was objected to, it seems to us to be established, not only that all the several sums of money found by the referee to be due to the relators are in fact due and unpaid, but that the *data* for the ascertainment of such amounts are, and have been since the same became due, in the possession of the defendants, and that, with the two minor exceptions above mentioned, vouchers or certificates of such amounts, or of the measurements from which the same were to be computed, have been once made by the defendants and returned to them by the relators at the time when partial payments were made thereon. It is therefore entirely practicable for the defendants to make the certificates required by the judgment in this case. The question recurs whether to make such certificates is so clearly within the official duty of the defendants as that performance thereof will be enforced by *mandamus.* We think it is so. Under their contracts with the relators they were bound to pay for the work done and material furnished according to measurements which were to be made, or caused to be made, by them. These measurements were made and the amounts due to the relators were ascertained or ascertainable therefrom. This obligation to pay was, of course, subject to the condition of money in their hands subject to such payment. If the money were now in their hands, *mandamus* would, no doubt, lie to compel its payment. If the money were in the hands of any official or other person subject to their order, the same means would be available to require them to make such order. In short, though not within the letter of their contract, it is clearly within its spirit that, in default of the ability on their part to make complete performance of the contract, it is their duty to do whatever lies in their power in the direction of such performance. The greater includes the less; the duty to pay the relators' claim includes the duty to do whatever acts are requisite or preliminary to such payment. This includes the making, or causing to be made, the estimates and measurements upon which payment was to be made. Those estimates and measurements, being made, were not solely for the information and convenience of the defendants, but for the benefit of the relators, as the stipulated evidence of the amount of work done and materials furnished by them, and as the means provided by the contracts by which they might obtain payment therefor. In respect to nearly all the claim of the relators, that evidence has once been furnished to them by the defendants in the form of vouchers, which were returned at the time the partial payments were made. We see no reason why they are not entitled to similar vouchers certifying the amounts reserved or balances remaining due, to serve as the basis for any application they may hereafter make for the payment of their just claim.

The objection that the appropriations so far made by the legislature to pay for the buildings erected by the defendants for the state have been exhausted,

and that no moneys are in the hands of the defendants, or subject to the warrant of the comptroller, applicable to the payment of the relator's claim, seems to us not to be an answer to this proceeding. In the view which we have taken of the contracts between the parties the relators are entitled to have the amounts which are due to them ascertained and certified by the defendants, for the purposes of whatever application or proceedings may be made or taken by them to obtain payment of what is their due. The state is indebted to them for the balance unpaid under their contracts, and it is to be presumed that some provision will be made for its payment on the production of the requisite evidence. It was perhaps a somewhat anomalous practice to take proof in this proceeding of the amounts due, and which the defendants should be required to certify. But such proof was made without objection on the part of the defendants, and the practice was not in any respect questioned by them either on the trial or on this appeal. The evidence was wholly undisputed, and must be taken as establishing, for all the purposes of this proceeding, the correctness of the measurements and computations which are to be certified by the defendants. In one respect we think the judgment should be modified. It was not competent for the court in this proceeding to determine the question of the allowance of interest on the amounts due, and the defendants were under no duty to certify in respect to that matter. The judgment should be modified by striking out whatever provisions it contains in respect to interest, and, as so modified, affirmed. All concur. So ordered.