RYAN v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. November 7, 1913.)

1. MUNICIPAL CORPORATIONS (§ 360*)—PUBLIC IMPROVEMENTS—BRIDGE ANCHORAGE—ADDITIONAL WORK.

Where plaintiff contracted to build a suspension bridge anchorage for defendant city according to plans and specifications, and the city, by insisting on a misconstruction of the specifications, compelled plaintiff to substitute a quantity of granite for limestone, the city was guilty of a breach of the contract, for which plaintiff was entitled to recover the difference between the value of the limestone rejected and the value of the granite substituted therefor.

[Ed. Note.—For other cases, see Municipal· Corporations, Cent. Dig. §§ 892, 892½; Dec. Dig. § 360.*]

2. MUNICIPAL CORPORATIONS (§ 360*) — PUBLIC IMPROVEMENTS — ADDITIONAL WORK.

Where plaintiff, under a contract for the construction of a bridge anchorage, was compelled to furnish additional labor and material to supply a shortage of height due to settlement of the anchorage, for which no allowance had been made by defendant's engineers in the specifications and drawings on which plaintiff's contract was based, he was entitled to compensation therefor as extra work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 892, 892½; Dec. Dig. § 360.*]

3. MUNICIPAL CORPORATIONS (§ 360*)—PERFORMANCE OF CONTRACT—LOSS OF MATERIAL.

In providing for the construction of a bridge anchorage, defendant city condemned an amount of land so slightly in excess of the space actually occupied by the anchorage structure as to compel plaintiff, a contractor, to drive ·his cofferdam timbers so close to the structure that, on all but the river. side, they became more or less bound· into the concrete of the foundations, so that, had plaintiff pulled them out when his work was finished, as he was required to do by a clause in his contract providing

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for the removal from the work of everything in the way of plant, etc., he might have seriously interfered with the integrity of the work, and to avoid this the city requested him to leave the piling in place. *Held*, that plaintiff was entitled to recover from the city the value of the piling so left.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 892, 892½; Dec. Dig. § 360.*]

4. MUNICIPAL CORPORATIONS (§ 370*) — PUBLIC IMPROVEMENTS — PAYMENTS — DELAY—INTEREST.

Where a city unreasonably delayed payments under a contract for the construction of a bridge anchorage beyond the time when they were due under the contract, the contractor was entitled to interest thereon.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 902, 903, 908, 909; Dec. Dig. § 370.*]

5. MUNICIPAL CORPORATIONS (§ 374*) — PUBLIC IMPROVEMENTS — PAYMENTS — DELAY—MEASURE OF DAMAGES.

Where a city delayed payments under a contract for a public improvement beyond the time fixed in the contract, the contractor could not recover general damages for losses occasioned by the delay; legal interest being presumptively sufficient compensation therefor in the absence of the contractor's election to rescind the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

6. MUNICIPAL CORPORATIONS (§ 374*)—CONSTRUCTION CONTRACT—PUBLIC IMPROVEMENTS—SUSPENSION OF WORK.

A clause, in a city's contract with plaintiff for the construction of a bridge anchorage, authorizing the city to suspend the whole or any part of the work without compensation to plaintiff, should be construed as covering only an actual cessation of work under direction of the city, and did not, while the work was actually progressing, serve as absolution for any and all delays that plaintiff might suffer incident to material changes of plan or failure to have completed, within the prescribed time, work to be done by others, on completion of which the progress of plaintiff's work necessarily depended; the city being under an implied obligation to proceed with good faith and diligence as to all such matters and carry them on without unnecessary delay.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

7. MUNICIPAL CORPORATIONS (§ 374*)—PERFORMANCE OF CONTRACT—DELAY— EVIDENCE.

In an action against a city for damages to a contractor from delay in the construction of a bridge anchorage, evidence *held* to require a finding that plaintiff was not materially delayed in the construction of his work by a change in the plans nor by the city's failure to make prompt and sufficient appropriations for continuing the work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

8. MUNICIPAL CORPORATIONS (§ 374*)—PUBLIC IMPROVEMENTS—CONSTRUCTION —DELAY.

A contractor for the construction of a bridge anchorage was not entitled to damages for delay resulting from the failure of other contractors with defendant city to complete their contracts for the cable within the time specified in such contracts, where it appeared that the time so fixed was unreasonably short, and the time consumed, considering unanticipated delays due in part to plaintiff's failure to clear away portions of his own plant and in part to a fire, was not unreasonably long.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 905, 910; Dec. Dig. § 374.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. Costs (§ 164*)—Difficult Case—Extra Allowance.

Where an action by a contractor for the construction of a bridge anchorage, against a city for breach of contract and for damages for delay, was long and involved intricate and difficult questions, and an extra allowance would afford plaintiff meager indemnity for the expense of the trial, it was properly granted.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 620–636; Dec. Dig. § 164.*]

Appeal from Judgment on Report of Referee.

Action by Patrick Ryan, as surviving partner, etc., against the City of New York. From a judgment in favor of plaintiff entered on a Referee's report, and from an order granting an additional allowance, both parties appeal. Affirmed.

See, also, 157 App. Div. 917, 142 N. Y. Supp. 1142.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

John C. Wait, of New York City, for plaintiff.
William E. C. Mayer, of Brooklyn, for defendant.

HOTCHKISS, J. The firm of which plaintiff is the survivor were the contractors for the construction of the Manhattan anchorage of the Williamsburg Bridge. This anchorage was authorized by the Laws of 1895, chapter 789, and was, in pursuance of that act, contracted for in the joint names of the mayor, etc., of New York and the city of Brooklyn on October 5, 1897. This was prior to the date when the Greater New York Charter became operative. The work of building the bridge embraced contracts with other concerns for cables and the several towers over which they were strung. The work under the plaintiff's contract was begun in October, 1897, and was completely finished about July or August, 1903. The contract provided for specific prices to be paid for piles, according to length, and "a sum of $716,770 for the remainder of the whole work complete in place." The masonry work included granite base or underpinning, granite face stones, ashlar shaft, and moulded granite coping, with undressed limestone in the interior and faced limestone for certain exterior parts. Monthly or progress payments of the usual character were to be made by the city as the work progressed, and final payment after completion. The case comes here on cross-appeals; the city appealing from the judgment in plaintiff's favor, and the plaintiff appealing from so much of the judgment as dismissed certain of his claims. The items upon which plaintiff was awarded judgment are referred to throughout the case by numbers, which enumeration I shall follow.

Item 14, damages because of being compelled to furnish increased quantities of granite under a wrongful construction of the specifications appliable to face stones; or, in the alternative, item 21, the value of face limestone and limestone-backing actually furnished but omitted from monthly and final estimates.

The specifications attached to the contract purport to be divided into general subjects and again into particular subjects. Stonework

and masonry seem to be included in a number of general titles, such as "Description," "Quality of Materials," "Backing Stones," "Knuckle Stones," "Coping of Cornice," etc. Under the general heading of "Masonry," with a subtitle of "Bond," is section 102, reading:

"The masonry will be laid in regular courses, and must be thoroughly bonded throughout. No stones in one course shall overlap the stones of the course next below by less than 15 inches."

Under the general title of "Face Stones" there are numerous subtitles. Included under "Headers" is section 109, reading:

"Every second or third stone in the face of each course shall be a header. Each header must be at least 3 feet in face width, and its length shall be at least 3 times its height."

Under the subtitle of "Stretchers" is section 110, reading:

"Stretchers shall not be less than twice nor more than 4 times their height in length, nor less than 3 feet wide."

Sections 111 and 112 bear subtitles of "Vertical Joints" and "Beds," and section 114, entitled "Bottom Beds, etc.," reads:

"The bottom bed shall always be the full size of the stone, and no stone shall have an overhanging top bed (*this clause applies also to backing*)."

The specifications also provided that:

"All questions as to their intent or meaning, or the intent or meaning of the drawings, should be referred to the (chief) engineer, whose decision, approved by the commissioners, shall be final."

The contract itself provided that the contractor should submit to the chief engineer "course plans," showing in detail the dimensions of each layer of stone for the anchorage. Such approval of the course plan was necessary before the stone could be cut. The first course plans prepared by plaintiff's engineers were submitted to the chief engineer, who rejected them, claiming they were not in accordance with the specifications because they did not show "15-inch" bond in the face stones. To this the plaintiff objected. After considerable discussion, the city modified its demand to the extent of permitting a lap of 11¼ to 11½ inches in the granite face ashlar. The practical difference between the parties with respect to the clauses of the contract affecting the question of bonding was that the construction claimed by the city required that at every alternate course of face granite there should be laid a second or interior course of granite. It is manifest that this construction required the use of very much more granite than would otherwise have been necessary, and, to a corresponding extent, required the use of less limestone, a much cheaper stone than granite.

The plaintiff continued to contend against the city's construction of the contract and insisted that, notwithstanding whatever was said about bonding in section 102 under the general title of "Masonry," the proper construction of the contract in this regard was to be found under the general heading of "Face Stones" as expressed in the various sections under the subtitles of "Headers," "Stretchers," "Vertical Joints," etc., laying particular stress upon section 114, entitled "Bottom Beds," and the last words thereof, which in the original are italicized and read,

"This clause also applies to *backing*"—thus, as plaintiff claimed, showing an intention to qualify any general expressions of section 102 by the particular phrases and measurements found in the sections under the general head of "Face Stones." Notwithstanding plaintiff's protest, the city insisted upon its construction, modified as above, and, still protesting, plaintiff completed the contract according to the city's demand.

[1] If the affirmance of the judgment, so far as this item is concerned, required the approval of certain classes of evidence offered by both parties and consisting in part of the testimony of experts as to the meaning of the contract, and in part of the practical construction put upon a different although similar contract between the city and another contractor, for the building of the Brooklyn anchorage of the same bridge, I should hesitate to express my concurrence. But upon other evidence of undoubted competence, voluminous in extent and convincing in weight, the learned referee has found that the position taken by the city, although not without some support from the confused expressions of the specifications, was without actual justification, and that the contract afforded it no valid ground for its demand. Under these circumstances, the act of the city in compelling plaintiff to substitute some 2,329 cubic yards of granite for a like quantity of limestone constituted a breach of the contract for which he is entitled to recover damages. Gearty v. Mayor, 171 N. Y. 61, 63 N. E. 804; Borough Const. Co. v. City of N. Y., 200 N. Y. 149, 93 N. E. 480, 140 Am. St. Rep. 633. The damages awarded were the difference between the value of the limestone rejected and the value of the granite substituted therefor. To this measure of damages no objection can be made.

[2] Item 2, additional labor and material in furnishing and setting masonry to compensate for a settlement of 2¾ inches in the anchorage: For this plaintiff recovered $3,508. It is not disputed that the anchorage settled 2¾ inches. The practical importance of this settlement arose from the fact that it decreased the height of the anchorage to an equal degree. The effect of the specifications and drawings was to fix the height of the anchorage, because the details of each course of stone, bed joints, etc., were exactly prescribed, and the total aggregated the height of the anchorage. Manifestly, if the anchorage was built according to the contract, any deficiency in the height arose from the failure of the city's engineers to provide for such settlement as was necessarily to be expected. I see no reason why plaintiff should not be compensated for the work covered by this item; and the amount allowed therefor by the referee was reasonable and is not seriously disputed.

[3] Item 13, value of sheet piling left in place and, at the request of the city, not withdrawn: It is not disputed that the sheet piling, which consisted of the timbers out of which a so-called cofferdam, surrounding the excavation, was constructed, was not withdrawn on three sides, but was left in place. The city contends that the evidence shows that this was done because plaintiff found it impossible to pull up the piling. There is testimony which gives color to such a claim, but the weight of evidence is to the contrary. The facts seem to have been that the city condemned an amount of land so slightly in excess of the space actually

occupied by the anchorage structure as to compel the contractor to drive his cofferdam timbers so close to the structure that, on all except the river side, they became bound more or less into the concrete of the foundations, so that, had the plaintiff pulled them out, as he was required to do under the clause of the contract binding him to remove from the work at the conclusion thereof everything in the way of plant, etc., belonging to him, he might have seriously interfered with the integrity of the work. To avoid this, the evidence justified the finding that the city requested plaintiff to leave the piling in place. It is true that the evidence of the value of this piling as secondhand material, in case it had been drawn out, was slight. Nevertheless there was some evidence from which such value could be inferred, and, taking all the evidence into consideration, the amount allowed by the referee seems to have been reasonable.

[4] Items 11 and 18 cover interest on delayed payments on account of monthly estimates. Item 20 is for interest because of similar delay in making the final payment. No question is made as to the correctness of the figures, but the liability of the city is denied. The evidence justified the finding that the payments were unreasonably delayed beyond the time when they were severally due according to the contract. The receipts given by plaintiff himself for the several monthly payments made to him or to his firm personally were qualified so as to reserve plaintiff's claim for interest. Certain other interim payments made to a bank to which they had been assigned by plaintiff as security for loans, and for which payments the bank necessarily receipted, were not made under circumstances which justify the presumption that they were received or paid with the intent to cut off plaintiff's claim for interest, or that the clean receipts given by the bank were evidence of any such intent. In view of these facts, I think the allowance of interest was proper.

The remaining items are 15 and 19, the former for furnishing larger knuckle or bearing stones than were required by the original plans, and the latter for cleaning face stones, etc., from dirt and unreasonable accumulations negligently permitted by the city; the two aggregating $822. As to these it is sufficient to say that their allowance involved questions of fact which I think were properly disposed of by the learned referee. This disposes of all the questions raised by defendants' appeal from the judgment.

On the plaintiff's appeal there is raised the question of his right to recover a large sum claimed as damages for alleged unreasonable delays on the part of the city. Two periods of construction were provided for by the contract. The first included the work up to a point which would allow the stringing of the cables, for which work a time period of 16 months from the execution of the contract and giving bond therefor was allowed. The second period was to begin within four months after plaintiff was notified by the chief engineer to resume work. On account of the first period, plaintiff claims a delay of approximately eight months; and on account of the second period, a delay of some eighteen months.

There is practically no dispute between the parties that the first stage of plaintiff's work was begun October 15, 1897, and was fully completed in March, 1900, a period of some 15 months in excess of the time stipulated in the contract. The second stage was begun in November, 1902, and completed in or about August, 1903. The causes of the alleged delays in the second stage fall into three general classes: (1) Failure to pay moneys earned and due under the contract; (2) time lost and expenses entailed by a change in the plans for the anchor chain chambers; (3) time lost and expenses incurred because of delay in letting and causing to be promptly executed the contracts for the towers and spans, viaducts and cables, the completion of all of which was necessary before plaintiff could begin work on the second stage of his contract.

[5] I can see no legal ground for awarding plaintiff general damages for any loss occasioned by delay on the part of the city in making its payment to him on contract time. For such delays, legal interest is presumptively sufficient compensation; and that plaintiff has already been awarded. While a failure by the city to pay as agreed might have afforded plaintiff ground for rescinding the contract (Wharton v. Winch, 140 N. Y. 287, 35 N. E. 589), he did not elect so to do. After having proceeded with the contract to completion, it would certainly be a novelty in the law if he could recover, beyond interest, damages for the city's failure to pay as and when agreed.

[6] There is a clause in the contract which gives the city the right to "suspend the whole or any part of the work   *   *   *   without compensation" to plaintiff; but I take it that this covers only an actual cessation of work under direction of the city, and does not, while the work is actually progressing, serve as absolution for any and all delays that the contractor may suffer. Although in express terms the contract contained nothing binding the city not to embarrass plaintiff by delays incident to material changes of plan, or to have completed within any prescribed time the work to be done by others, and upon the completion of which the forwarding of plaintiff's work necessarily depended, nor even any words of express obligation on the city's part to proceed with diligence in those things which the situation necessarily indicated were to be done by it and the doing of which controlled the progress of plaintiff's work, I take it that it was under an implied obligation of good faith and diligence with respect to all of these matters, and that, having entered into the contract with plaintiff, it was bound to go on with the work without unnecessary delay and carry the business to completion within a reasonable time. McMaster v. State, 108 N. Y. 542, 15 N. E. 417. In the light of this principle, what does the record show?

[7] On August 30, 1898, plaintiff had been notified of an intended change of plan, and on October 3d he received the detailed or working plan, embracing the proposed changes, which were different from those indicated by the communication of August 30th. The plaintiff did not finish the work of demolishing the old buildings and clearing the site of the anchorage, excavating to the necessary depth, and driving the foundation piles upon which the timbers and concrete, which were to be covered by grillage and masonry, rested, until late in October, 1898,

about a year after he had commenced work. This left not to exceed four months within which to complete the first stage of his contract. It is idle to argue that up to this time plaintiff had been materially, if at all, delayed by reason of the changes made by the city in the anchor chain chambers, because he had not then reached the stage of the work where construction of these chambers was to commence. It may be true that, as an incident to the changed plans, additional forms for concrete and a new and perhaps novel system of waterproofing was required, one or both of which added somewhat to the expense and time required for completing the work up to the point where the laying of masonry was to begin. But however this may be, I can find nothing in the evidence which would permit of a finding as to what such expense amounted to or what the delay, if any, was, and it is only by inference that the fact of any such expense or delay can be learned. On March 15th, less than five months after the preliminary work was completed, the anchor chain chambers were finished. I see no ground for the assertion of plaintiff's counsel that these five months, or any equal period, was lost to plaintiff by any act of the city. It is conceded in the brief of plaintiff's counsel that during the particular period referred to "the work was carried on continuously and expeditiously." It is apparent that construction of the chambers as originally planned would have taken a considerable time; that it would have taken less than was occupied in completing according to the final plans is not shown.

In excuse for the long time, over one year, which plaintiff took to complete the work preliminary to the construction of the chambers, and as justifying such delay, the plaintiff relies upon evidence tending to show a failure on the part of the city to make appropriations for continuing the work, during which period plaintiff admits a corresponding cessation of activities on his part because of want of funds. For any unreasonable delay due to its failure to provide moneys for the cost of work to be done by others, and upon which the progress of plaintiff's work depended, the city, within the rule already referred to, would be liable to respond in damages for any loss to plaintiff. But, as I understand it, plaintiff, under this item of his demands, does not claim to have suffered delay from any such cause. Such delays as he complains of were incident to his own failure to advance his own work more expeditiously, and as such they were, in the eye of the law, voluntary because directly chargeable to plaintiff himself; for if, in anticipation of sufficient funds not forthcoming, he relaxed his efforts and chose to apportion the amount of his work to the sums which would probably be at the disposal of the city on account of his contract, I know of no rule which would permit of his recovering damages, if for no better reason, because none were suffered, as he could not be entitled to pay for more work than he did. If he sought to put the city in default, he should have taken the steps necessary to do so. It is possible to conceive of a state of facts to which the foregoing principle might not apply, as where an employer had definitely announced an unqualified intention not to allow the work to proceed beyond the pace to which the contractor was unreasonably limited and to

refuse payment for any additional work. See Wharton v. Winch, supra. But such is not the present case.

[8] The plaintiff's claims arising out of an alleged delay of 18 months on the part of the city in causing to be completed the several contracts for the towers and spans, viaducts, and cables, remain to be considered. The chief cause of the alleged delay plaintiff attributes to the time consumed by the contractors for the cable, who had agreed to complete in ten months. The plaintiff contends that the city is bound by the ten months fixed by the contract, which prima facie was a reasonable time. The referee has found that in fixing ten months for the performance of this work both the city and its contractor were too sanguine, and that the period so fixed was unreasonably short, that the time actually consumed, and which there is reason to believe was extended to some degree by a failure on plaintiff's part to clear away portions of his plant, and in part by a fire and by other unanticipated delays which could not have been reasonably avoided, was not unreasonable.

I have carefully read and weighed the mass of oral and documentary evidence bearing, not only on the work of the cable contractors, but upon that of the contractors for towers and spans. As a result, I confess that the subject, as an original question, impresses me as one of doubt. Having in mind the periods which originally it was believed the work would consume, beyond question there were delays. They were fairly and beyond doubt attributable in part, not to one alone, but to several contractors (among whom the plaintiff may justly be suspected of being included), and possibly in part to the failure of the city to provide necessary funds for the more rapid completion of the work. But to what extent, if any, the neglect of the city contributed to the delay, I find impossible to determine, because the period of any such delay seems to be inextricably confused with contemporaneous periods of apparent and excusable delay on the part of one or more of the contractors. I am not unmindful of the fact that, as between the plaintiff and the defendant, the latter is responsible for any unreasonable delay on the part of other contractors, whether caused by the city's failure to provide funds or by other of its own acts or omissions.

But whether any delay was or was not unreasonable, and hence wrongful, must be determined in the light of the entire situation. Here was an undertaking of great magnitude and public importance. Its performance was committed to several contractors, whose work to a certain degree interlocked, so that the progress of one measurably depended upon the others. The celerity with which the entire task could be completed depended upon a vast number of details, difficult, complicated, delicate, to some extent novel, requiring time for experiment and the discovery of methods for their successful solution. Experience has shown that in construction work of a character simple and insignificant, in comparison with this in question, it commonly happens that the time for completion, as originally contracted for or anticipated, is long exceeded, bringing disappointment to all and loss to some. Under these circumstances, men are prone to judge the past in the light of their later experience, and to entirely overlook, or attach too

little weight to, an infinitude of things of greater or less importance, which, combined, tended largely to produce the unfortunate result, and which, in the broader aspect, were either unavoidable or excusable. The evidence in this case offers abundant opportunity for this point of view, which was that the learned referee seems to have taken. On the whole, I cannot say that his finding that the time actually consumed was reasonable is so clearly against the weight of evidence as to justify a reversal.

[9] The extra allowance was justified. The case was long, intricate, and difficult, and necessarily involved plaintiff in an expense for its trial, for which the allowance is but meager indemnity.

The judgment should be affirmed, without costs, and the order for an extra allowance affirmed with $10 costs to the plaintiff. All concur.

---

(158 App. Div. 665.)

### BARSTOW v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, First Department.   November 7, 1913.)

1. COMMERCE (§ 8*)—POWER TO REGULATE—EXERCISE BY CONGRESS OF POWER TO REGULATE INTERSTATE COMMERCE.

All state laws affecting the right of carriers to restrict their liability to an agreed or declared valuation on interstate shipments are superseded by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1288) § 7, known as the Carmack Amendment to the Interstate Commerce Act, limiting the right of contracting against liability, and Act June 18, 1910, c. 309, 36 Stat. 546 (U. S. Comp. St. Supp. 1911, p. 1286), § 7, requiring interstate carriers to prescribe regulations respecting the carrying of baggage, by which acts Congress took possession of the subject, and all questions arising thereunder are controlled by the decisions of the United States Supreme Court.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

2. CARRIERS (§ 405*) — CARRIAGE OF PASSENGERS — BAGGAGE — LIMITATION OF LIABILITY.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1544–1549; Dec. Dig. § 405.*]

Scott, J., dissenting.

Controversy, submitted upon an agreed statement of facts, by Katherine Barstow against the New York, New Haven & Hartford Railroad Company to recover the value of plaintiff's baggage which de-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes