### LEHMAIER et al. v. STANDARD SPECIALTY & TUBE CO.

(Supreme Court, Appellate Division, First Department. January 17, 1908.)

**1. SALES—CONTRACT—BREACH.**

Where defendant agreed to purchase from plaintiffs its entire supply of metal used in making collapsible tubes and ketchup caps between specified dates, plaintiffs to refrain from selling to any one but defendant, during the period covered by the contract, defendant's purchase of such metal from other manufacturers constituted a breach of the contract.

**2. SAME—DAMAGES.**

Defendant contracted to purchase its entire supply of metal for making collapsible tubes and ketchup caps between specified dates from plaintiffs. Plaintiffs, in order to fill the contract, immediately purchased material sufficient to have supplied defendant's requirements from January 6, 1904, until May, 1906, but for the balance plaintiffs would have been required to purchase material at such an increased price that there would have been no profit in the enterprise. Defendant never refused to comply with its contract, but did purchase metal from other manufacturers. Plaintiffs did not demand that defendant receive any particular amount of the metal; the amount ordered from plaintiffs, however, being so small that plaintiffs were required to use up the metal purchased in other operations. Plaintiffs first sued to enforce the contract as an existing one, but after the contract term had expired turned the action into one for breach of contract by amendment. *Held*, that the measure of plaintiffs' damages was the difference in the cost of manufacturing the materials purchased by plaintiffs before the rise in the price and the contract price.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1099.]

**3. SAME—PERFORMANCE BY PLAINTIFF—EVIDENCE.**

Where, in an action for breach of contract by which defendant agreed to purchase its entire supply of metal used for collapsible tubes and ketchup caps from plaintiff, defendant denied that plaintiff had performed the contract as alleged, and claimed that the metal furnished by plaintiff before it purchased from other manufacturers was found to be unsatisfactory, evidence that the metal furnished by plaintiff prior to defendant's breach was unsatisfactory was admissible on the question whether plaintiff had complied with the contract on his part.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1096.]

**4. SAME—ACCEPTANCE—DEFECTS.**

The rule that an objection to the quality of an article purchased will not survive acceptance by the buyer applies only to an action for the price, and does not prevent the buyer from showing that the goods furnished under the contract did not comply therewith for the purpose of proving a breach by the seller in an action for damages for an alleged breach of contract by the buyer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 460.]

Appeal from Trial Term.

Action by Rachel Lehmaier and others, composing the firm of Lehmaier, Schwartz & Co., against the Standard Specialty & Tube Company. From a judgment for plaintiffs and from an order denying defendant's motion for a new trial, defendant appeals. Reversed.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Benjamin N. Cardozo, for appellant.

Leopold B. Pollak, for respondents.

INGRAHAM, J.  This action was brought to recover the damages caused by the defendant's breach of a contract made January 8, 1904, whereby the defendant agreed to purchase from the plaintiffs the entire supply of metal used by it in making collapsible tubes and ketchup caps between January 6, 1904, and January 6, 1907, the metal to be rolled to the thickness required and to be satisfactory in every respect, and to refrain from selling to any one but the defendant coated metal for making collapsible tubes during the period covered by the contract.  The complaint alleges that the plaintiffs performed each and every of the terms of the agreement on their part required to be performed; that the defendant committed a breach of the agreement, in that it failed to purchase from the plaintiffs, as by the agreement it was required to do, all the metal used by it in making collapsible tubes and ketchup caps, but had, on the contrary, purchased the metal it used in making collapsible tubes and ketchup caps from persons, firms, or corporations other than the plaintiffs.  The answer admits the making of the contract; denies that the plaintiffs performed the contract on their part; admits that the defendant purchased and used metals in making collapsible tubes from persons and corporations other than the plaintiffs; and sets up a counterclaim.  Upon the trial it was proved that the defendant commenced to take metal from the plaintiffs under the contract in March, 1904; that the defendant purchased from others than the plaintiffs during the period covered by the contract 21,765 pounds of tin, which at the contract price would amount to $28,895.79, which would have been $652.95 above the market price of tin during that period; that the cost of rolling the tin would have been $103.39, making the damage sustained by the plaintiffs by reason of the defendant refusing to purchase the tin from the plaintiffs under the contract $544.66.  I do not understand that any point is made by the appellant as to the amount of damages allowed for breach of the contract in relation to the tin; the question arising under the breach in relation to the other branch of the contract for the purchase of what is called "coated metal."  The question arises under the clause of the contract by which the plaintiffs were to furnish the defendant coated metal in sheets for which the defendant was to pay 7 cents per pound.  It appeared that the defendant commenced the purchase of coated metal from others than the plaintiffs on April 5, 1904, and purchased during the year 1904 approximately 51,037 pounds; during the year 1905 approximately 102,627½ pounds; and during the whole period covered by the contract 412,797½ pounds.  It also appeared that after the making of the contract the plaintiffs estimated the amount of lead and tin that would be required to furnish the defendant with the amount that it was estimated it would require during the term of the contract at 100 tons of lead and 10 tons of tin, and purchased this amount of these metals which they reserved for use in completing the contract; that the defendant discontinued ordering any coated metal from the plaintiffs after March, 1904, and after January 1, 1905, the plaintiffs used in other ways the lead and tin that had been purchased and reserved to manufacture the coated metal for the defendant.  The plaintiffs paid for this tin at the rate of 29.25 cents per pound, and for the lead 4.45 cents per pound.  At these prices the cost of the completed product was

estimated at 5.862 cents per pound, and plaintiffs were allowed to recover the difference between this cost of the product and the amount that the defendant was to pay under the contract, namely, 7 cents per pound. It further appeared that the 100 tons of lead and 10 tons of tin would have made approximately 225,000 pounds of the coated metal. During the year 1904 the price of these metals remained about the same, so that, when the plaintiffs used the lead and tin which they had purchased for this contract in their own business, the price was about the same as that at which they had purchased it. After January, 1905, the price of lead advanced. In August, 1905, it was 4.70 cents per pound; in September, 1905, it was 4.87½ cents per pound; in October, 1905, it was 5.10 cents per pound; in November, 1905, it was 5.48 cents per pound; and in 1905 the price ranged from 5.35 cents per pound in January to 6.8 cents per pound in December.

It would seem, therefore, that immediately after the contract was made the plaintiffs purchased 100 tons of lead and 10 tons of tin to be used by them in carrying out the contract; that that amount of lead and tin would have produced 225,000 pounds of the manufactured product which would have been sufficient to supply the requirements of the defendant to May, 1906; that for any additional metal that the plaintiffs would have been required to purchase to manufacture the product they would have been compelled to pay an increased price, so that it may fairly be said that there would have been no profit in carrying out the contract. The first question relating to the measure of damages is whether there can be said to be a total breach of the contract by the defendant in consequence of its neglect to purchase from the plaintiffs the metal that it required from time to time. We do not think there was any total and final breach by the defendant. The defendant never refused to carry out the contract. No demand was ever made by the plaintiffs that it receive any particular amount of this metal; and there was no refusal by the defendant to comply with its contract. There was complaint made about the quality of the metal furnished by the plaintiffs with promises by the plaintiffs to improve the quality. Both parties to the contract understood the purpose for which the metal was to be used, and the contract made was based upon that knowledge. It does not appear that metal that was satisfactory to the defendant, or that they were bound to consider as satisfactory, was ever furnished or tendered. It seems to me, therefore, that the case must be considered as if each purchase of metal by the defendant was a partial breach of its contract to purchase all the metal it required from the plaintiffs, and the plaintiffs were entitled to recover the difference between what it would have cost them to furnish each lot of metal that the defendant purchased from others and the price which they would have been entitled to receive from the defendant. If we may assume that the conduct of the defendant would have justified the plaintiffs in electing to consider such conduct as a total breach of the contract, there is no evidence of such an election; on the contrary, plaintiffs insisted that the contract was in force and commenced this action to enforce it as an existing contract, and it was long after the action had commenced, and long after the period covered by the contract, that the action was, by an amendment to the com-

plaint, turned into an action to recover for a breach of the contract. I think, therefore, that this action must be treated as having been commenced after the period covered by the contract had expired, with no evidence of a distinct refusal to perform on behalf of the defendant, no tender or demand by the plaintiffs that the defendant perform, and without evidence that at any time prior to the amendment to the complaint the plaintiffs had elected to treat the defendant's conduct as a breach. This brings the case within Brown v. Muller, L. R. 7 Ex. 319, and Roper v. Johnson, L. R. 8 C. P. 167, and what was said in the latter case by Keating, J., seems to me to be the reasonable rule to apply in cases of a breach of such a contract and one which affords the injured party full indemnity:

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own. He remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstances which would justify him in declining to complete it. On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the nonperformance of the contract at the appointed time. And he adds this qualification: 'Subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.' * * * It seems to me that when the plaintiffs have shown that there has been a distinct breach of the contract on the part of the defendant, and have further shown that at the periods at which the coal should have been delivered they could only have obtained them at an advanced price, they were entitled to the difference between that advanced price and the contract price, unless the defendant gave evidence that another similar contract might have been obtained on more mitigated terms."

See, also, McMaster v. State of New York, 108 N. Y. 542, 15 N. E. 417.

Applying this rule, the solution seems to me quite plain. What sum will indemnify the plaintiffs for the failure of the defendant to comply with his contract and purchase this metal from the plaintiffs? Surely the difference in the cost of manufacturing the metal and the amount that the plaintiffs were to receive for it from the defendant. The plaintiffs had supplied themselves with the constituent metals necessary for the manufacture of the completed product. If the defendant had complied with its agreement, the plaintiffs would have manufactured that metal thus on hand and purchased for that purpose into the coated metal, and delivered it to the defendant, and would therefore have made as profit the difference between the cost of the product to be delivered to the defendant and what the defendant would have been required to pay for it. During the period that the metal purchased would have sufficed to supply the wants of the defendant, the price of the component metals had not advanced, so as to make a serious difference in the result. It seems to me that the plaintiffs were entitled to recover this difference upon the 225,000 pounds of metal that the 100 tons of lead and 10 tons of tin would provide; but it is also equally

clear that as to the balance of the coated metal the plaintiffs could not have purchased the component metals at a price that would have yielded any profit, and that, therefore, as to the subsequent installments, the plaintiffs were entitled only to nominal damages.

Were this the only question presented, I think we could reduce the damages to the amount indicated and affirm as to that amount, for on the trial the question was treated purely as a question of law, and there was no substantial dispute as to any of the facts which would have a bearing upon the case under the construction of the contract which we have adopted. It seems to me, however, that it was error for the court below to refuse to admit evidence to show that the metal that the plaintiffs furnished was not satisfactory to the defendant, as it was not of a character suitable to manufacture these collapsible tubes, for which both plaintiffs and defendant understood that the metal was to be used. It appeared from the evidence that, after the delivery of the first shipment, the defendant expressed dissatisfaction with the metal, saying that the core of the metal should be slightly harder to get the best results, and requesting additional shipments as soon as possible. This letter was dated February 8, 1904. On February 20, 1904, the defendant wrote the plaintiffs, saying that the quality of the coated metal of a shipment of February 12th was satisfactory, and wished the plaintiffs would furnish the defendant the same grade. On March 11th the defendant wrote plaintiffs that they had waited until the shipment of March 4th was received before taking the matter up in further detail, as the defendant wished to try it to determine whether it was any better than the former lots sent; that "we find that, while it may be a little improvement, it is not yet as we think it should be, nor as good as we used when operating our factory at New York." The defendant then sent samples of the metal to the plaintiffs, stating their objections to it, and in reply to that the plaintiffs wrote to the defendant on March 12th admitting that some of the samples were unsatisfactory, and closing:

"In justice to ourselves, we think that you should try your very best to use up all the metal sent you, and we, on the other hand, will do our utmost in the way of experimenting to give you improved metal over any heretofore produced."

This was all before the first breach of the contract by the defendant. Defendant then attempted to prove the quality of this metal that had been furnished by the plaintiffs prior to April 5, 1904, when they made their first purchase from others. This was objected to as immaterial, whereupon the defendant's counsel stated:

"I expect to show by this witness that the coated metal furnished by the plaintiff to the defendant was imperfect and produced bad tubes, and that it contained a number of defects, and that the product, owing to the condition of the metal furnished, was imperfect and unsaleable."

"The Court: That is the metal that you kept and paid for?
"Defendant's Counsel: Yes."

The objection was then renewed by the plaintiffs and the objection sustained, and to that the defendant's counsel excepted. I think this evidence should have been admitted. The answer of the defendant denied the allegation that plaintiffs had performed the contract, and al-

leged that the metal furnished by the plaintiffs was found to be unsatisfactory in every respect, and that the defendant has been at all times ready and willing to carry out said contract, but that the plaintiffs have neglected and refused to carry out the said contract on their part, and have committed a breach of the contract, in that they have failed to furnish the defendant the metals referred to in said complaint rolled to the thickness required and satisfactory in every respect, and at the price set forth in the contract, as a counterclaim for which the defendant asked an affirmative judgment of $12,000. While I have doubts as to whether there was evidence to sustain the counterclaim, I think the evidence was competent upon the question as to whether the plaintiffs had complied · with their contract, and had furnished coated metal as provided for by the contract. Certainly, if the plaintiffs had failed to furnish the metal contemplated by the contract suitable for the manufacture of these collapsible tubes that was reasonably satisfactory to the defendant for that purpose, it was not a breach of the contract for the defendant to purchase from others such metal as would answer the purpose for which both parties understood the metal was to be used. The rule contended for by the plaintiffs that an objection to the metal as not complying with the contract would not survive acceptance by the vendee has no application, as that applies only to an action for the purchase price, and that the defendant has recognized by paying for the metal that was purchased. The question here is whether there was a breach of the contract by reason of the defendant purchasing the metal from others, and I think upon that question it was competent for the defendant to show that the metal furnished by the plaintiffs was not of the quality or character required by the contract, and that, in consequence of the failure of the plaintiffs to furnish the coated metal that the contract required, the defendant was compelled to go out and purchase other metal in order to carry on its business. The question was as to whether there was a breach by the defendant, and it seems to me that there was no breach if the act of the defendant in purchasing the metal from others was made necessary by the quality of the metal that had been furnished by the plaintiffs, and which was of itself a violation of the contract by the plaintiffs. I think this evidence should have been admitted, and it was error to exclude it.

It follows that the judgment and order must be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.