[No. 11771. Department Two. February 18, 1915.]

## G. J. KIEBURTZ et al., Appellants, v. THE CITY OF SEATTLE, Respondent.[1]

MUNICIPAL CORPORATIONS — IMPROVEMENTS — CONTRACTS — EXTRA COMPENSATION—ALTERATIONS IN PLANS. Where the contract price of a public improvement is based on a unit system, a right of recovery cannot be grounded upon a loss caused by a change in the plans of the work increasing the number of units of one class and decreasing the number in another, especially where the city is empowered by the contract to make "variations in the quantity of work to be done."

SAME. A contractor engaged in the construction of a public reservoir cannot recover for loss occasioned by a change in the amount of excavation and the necessary removal of excavated material from what he understood as necessary through an inspection of the conditions existing at the time he bid thereon, where the specifications expressly provided that the slopes of the reservoir basins were to be excavated to such depth as would reduce them to plane surfaces and this depth was to be determined by the city engineer during the progress of the work; that the excavated material was to be removed from the basins and deposited at such points as the city engineer might direct; that such excavation should be paid for at the rate bid per cubic yard, which price should include the cost of making all excavations, loading, hauling and dumping the material, and should also include trimming the slopes and bottoms and everything necessary to secure the finished result; and that the grades and lines would be given by the engineer in charge on hubs driven in the bottom and slopes of the reservoir basins.

SAME. In such a case, the contractor had no right to assume that the hubs set at the time of the bid marked the true surface of the slopes, or that gullies in the slopes were to be refilled, instead of excavating the slopes to the depth of the gullies, where the contract as to refilling referred only to refilling spaces caused by the excavation of "unsuitable materials" found in the reservoir basins.

CONTRACTS—CONSTRUCTION—EXPERT OPINION—QUESTION FOR JURY. Where a contract for construction work was of doubtful interpretation, and the opinions of experts differed thereon, raising a substantial conflict in the evidence, a question for the jury, rather than the court, is presented as to the proper interpretation, and their verdict thereon is conclusive.

[1]Reported in 146 Pac. 400.

MUNICIPAL CORPORATIONS—IMPROVEMENTS—CONTRACTS—CHARGES—ACTIONS—INSTRUCTIONS. The refusal of a requested instruction to the effect that the city engineer did not have the right under the contract to arbitrarily refuse to allow for extra work caused by changes in the plan of the work, where such changes caused a loss to the contractor, was not error, where, by instructions given, the jury were charged that, if they found that a material change had been made in the character of the work, not contemplated by the contract, and such change had materially increased the cost of the work to the contractor to his damage, the contractor was not limited to the contract price, but could recover the increased cost of the work.

SAME—CONTRACTS—INTERPRETATION BY OFFICERS—ESTOPPEL. The fact that employees in the city engineer's office agreed with the contractor as to the interpretation of the specifications for public work on a reservoir, prior to bidding by the contractor, would not estop the city from asserting that the setting back of stakes then in place as marking the slope of the reservoir was not a material change, where the call for bids named the city engineer as the person authorized to elucidate the plans, and it was not shown that the employees consulted had authority to bind the city.

SAME—IMPROVEMENTS—CONTRACTS—CHANGES. A clause in a contract for public work providing that "the city engineer or board of public works shall have the right to diminish, increase or eliminate any of the items" therein, without such action constituting "a claim for loss of anticipated profits," does not permit radical changes in the contract such as will materially reduce the profits; as entirely eliminating sidewalks around a reservoir which the contractor had sublet at a profit of $3,179, but is restricted to minor changes incidental to completion of the work, or necessary to overcome engineering difficulties.

JUDGMENT—NOTWITHSTANDING VERDICT—TIME FOR MOTION. A party is not precluded from seasonably interposing a motion for a judgment notwithstanding the verdict by suffering the case to go to the jury on the facts without interposing a motion for nonsuit, for directed verdict, or a challenge to the sufficiency of the evidence.

MUNICIPAL CORPORATIONS—IMPROVEMENTS—CONTRACTS—CHANGES—COMPENSATION. Although changes in the plans of a public contract work may belong to the inconsequential class, the contractors thereon are entitled to remuneration for expenditure incurred with a view to the performance of the omitted work, prior to notification by the city of its proposed abandonment.

SAME—PERFORMANCE—DEFECTIVE MATERIAL. A contractor on a public work is not entitled to recover for rivet iron, admittedly not of the quality required by the contract and condemned for that rea-

son, where it does not appear that the city engineer selected the rivets, as claimed, but that they were purchased by the contractors on their own responsibility.

Appeal from a judgment of the superior court for King county, Tallman, J., entered February 11, 1913, upon the verdict of a jury rendered in favor of the defendant, in an action on contract. Reversed.

*Preston & Thorgrimson*, for appellants.

*James E. Bradford* and *Ralph S. Pierce*, for respondent.

FULLERTON, J.—By ordinance dated January 31, 1908, the city of Seattle authorized the construction, as part of its water system, of two certain reservoirs, known in the record as the Beacon Hill reservoirs. Subsequent thereto, it caused the basins of the proposed reservoirs to be excavated down to the rough levels of their dimensions as contemplated by the general plan. On May 24, 1910, the city, through its board of public works, adopted plans and specifications for the completion of the reservoirs; these provided for the excavation of the basins down to their neat levels; the installation of the necessary drains, inlets, outlets, and overflows; the lining of the basins with concrete and the erection of permanent barriers around them; the grading, topsoiling and seeding to clover the outer slopes of the reservoirs; the grading, putting in sidewalks, curbs and gutters, on the street bordering on the north of the reservoirs, and, in fine, the details of finished reservoirs. Estimates of the amount of excavation required to bring the basins down to their neat lines, together with estimates of the quantities of materials required to complete the work, were prepared by the city, and a call was made for sealed proposals for the performance of the work in accordance with the plans and specifications adopted. The call required the proposals to be made on a unit basis; that is to say, at so much for each several unit quantity into which the city had divided the work. The appellants in this action submitted such a pro-

posal, which the city accepted, and subsequently a written contract was entered into between them and the city for the performance of the work.

In the course of the performance of the work, the city, over the objection of the contractors, directed certain parts of the work contemplated by the contract to be omitted; and, according to the contention of the contractors, made changes in the neat lines of reservoir basins, thereby greatly increasing the amount of excavation, and greatly lessening the amount of refilling and backfilling originally contemplated, to their loss and damage. On the completion of the contract to the satisfaction of the city, the contractors sought to have the matters in dispute adjusted with the city; but, failing therein, brought the present action to recover the losses claimed to have been suffered thereby. The case was tried to a jury, which returned a verdict against the contractors on all of the items in dispute submitted to them, save one which the city confessed. In due season, after the return of the verdict, the contractors moved for a judgment notwithstanding the verdict, on the items wherein the jury found against them, and, in the alternative, for a new trial. Both motions were overruled and judgment was entered on the verdict. The contractors appeal.

The first item for which the appellants contend they should have been awarded judgment notwithstanding the verdict, is a claim for losses caused by what they conceive to be a change in the plans of the work, made subsequent to the execution of the contract, whereby a certain character of the work was eliminated and another character greatly augmented. It appears that a considerable time elapsed between the date the reservoirs were excavated and the date the city called for proposals for their completion, during which time they were left unprotected from the elements, the result being that a considerable quantity of earth had washed from the sides of the basins to the bottoms thereof, leaving the sides full of gullies and ridges which were required to be brought

to a common surface before the concrete lining of the basins could be put in place. It is the appellants' contention that, prior to bidding on the work, they examined the conditions as they existed on the ground and discovered that the gullies in the sides of the basins extended below the lines of their contemplated surfaces, if the stakes and hubs in place and the protracted measurements given on the plans indicated the true dimensions of the basins; that they interpreted the specifications to mean, in the light of these conditions, that the sides of the reservoirs would be brought to their true surfaces by filling in these gullies either with a cheap form of concrete described in the specifications, or with the earth that had washed therefrom, or with earth that they would be required to excavate from the bottoms of the reservoirs in order to insert the necessary drain and other pipes and to furnish a toe for the support of the concrete with which the sides were to be lined; that, to avoid misunderstandings and mistakes, they took the question up with the city engineer's office, as they were invited to do by the advertisement for proposals, and were assured that their interpretation of the plans and specifications was correct; that, acting upon this information, they submitted a bid of $.72 per cubic yard for excavation and $1.05 per cubic yard for refilling, to be measured in place, which bid, while sufficiently remunerative for the work of excavation were they permitted to perform the refilling work contemplated, was grossly inadequate were they required to remove the earth excavated entirely from the basins.

It further appears that, during the progress of the work, when the contractors called for the surface lines of the sides of the basins, the city's engineers set the lines in such a manner as to require such sides to be cut back to the bottoms of the gullies caused by the erosions, thus doing away entirely with any refilling of the sides, and greatly increasing the amount of excavation. The contractors estimated the amount of excavation at 6,800 cubic yards, 4,270 cubic yards

of which would be required for refilling the erosions; the city's estimate of the amount to be excavated in its call for bids was the same as that of the contractors, that is, 6,800 cubic yards (no estimate being made of any refilling), whereas the amount actually required to be excavated and removed from the basin was 12,050 yards. The work cost the contractors $20,500.48; being $11,820 more than the sum paid them by the city for the work, and, as they estimate it, $13,079.98 more than it would have cost them had they been permitted to perform the work in the manner they understood they would be permitted to perform it when making their bid.

The specifications forming a part of the contract, and material to the question here in consideration, read as follows:

"Excavation: The contractor shall make such excavation as may be necessary to bring the surface on which the concrete lining is to be placed to a true form and grade. The slopes of the reservoir basins are to be excavated to such a depth as will reduce them to plane surfaces. The depth of this excavation will be determined by the city engineer during the progress of the work. Particular attention is called to the necessity for accurately finishing the surface to be concreted, as no extra yardage in concrete will be allowed for areas excavated below grade, unless such excavation below grade is ordered by the engineer in charge. Excavation, as here specified, shall also include the removal of all earth remaining within the neat lines of the reservoir basins, the excavation of all trenches at the toe of slopes, excavation for ribs, tile drains and overflows, the surfacing of the bottom and slopes of the reservoir, where necessary, and in general, all excavation within the reservoir basins. Excavated material shall be removed from the reservoir basins and deposited at such points as may be directed by the city engineer.

"Excavation in reservoir basins as specified in the paragraph above, will be paid for at the rate bid therefor per cubic yard, measured in cut only, and the price so bid shall include the cost of making all excavations, loading into wagons, or other means of moving, hauling and dumping, and shall also include the labor of trimming the slopes and bottom of the reservoir basins to true form and grade, the furnishing and setting of all necessary guide or slope boards and everything

of whatever kind or nature necessary to secure the finished result.

"Re-filling: Where unsuitable material is found in the reservoir basin, it shall be excavated to the satisfaction of the city engineer, and such excavation will be paid for at the rate bid for excavation per cubic yard. The space so excavated shall be refilled with proper material and thoroughly tamped or rolled into place. The material thus refilled will be paid for at the rate bid for 're-filling' per cubic yard, and the price so bid shall include the cost of rolling or tamping.

"Concrete Filling: When so ordered by the city engineer, channels, or depressions, eroded in the sides and bottom of the reservoir basins, shall be re-filled with concrete which shall be mixed in the proportion of one (1) part of cement to four (4) parts of sand and eight (8) parts of gravel.

"Concrete filling will be paid for at the rate bid therefor per cubic yard in place.

"Grades and alignment: Grades and lines will be given by the engineer in charge on hubs driven in the bottom and slopes of the reservoir basin.

"(20)  The city engineer shall have the right to make changes in the location, form, dimensions, grades, alignment, and make any variations in the quantity of the work to be done, as exhibited in the schedule of prices or bid for said work, and to entirely exclude any of the items of work relating to said quantities at any time, either before the commencement of the work or during the progress, without thereby altering or invalidating any of the prices herein named. Should such action diminish the amount of work that would otherwise be done, no claim shall be made for damages on the ground of loss of anticipated profits on work so dispensed with; and should such action be taken after the commencement of any particular piece of work, and result thereby in extra cost to the contractor, the city engineer shall estimate the amount to be allowed therefor which he shall consider fair and equitable, and his decision shall be final and conclusive."

The contentions of the contractors on this branch of the case can best be stated in the language of their learned counsel. They say:

"That the enlarging of the reservoir basins by setting back
the slopes having entirely changed the plan of the work and
the cost thereof, constituted a material alteration, which was
not allowable under the contract, and that, therefore, under
the authorities, the city was absolutely responsible to the con-
tractor for the increased cost thereof.    But in any event if
the city did not have the right to make such change under
the contract, it then came within section 20 of the specifica-
tions, which provides for payment of any increase in cost;
and the action of the city engineer in refusing to allow any
such increase of cost was arbitrary and did not bind appel-
lants."

It is undoubtedly a general rule that, where a municipality
lets work of a public nature to a contractor to be performed
according to specific plans and specifications at a stated price
for the completed work, and afterwards radically or materi-
ally changes the plan of the work so as to increase the cost
of performance, or orders and directs the contractor to per-
form work or furnish material not within the contemplation
of the original contract, the municipality becomes liable to
the contractor for the increased cost of the work, or for the
extra cost of the labor or material.    The same rule undoubted-
ly applies to any work or material directed to be performed
or furnished not falling within the work contemplated by the
contract where the compensation is not a fixed sum for the
completed work, but is a sum to be determined from a fixed
price per class unit multiplied by the number of such units
in the completed work.    But in a work where the contract
price is based on a unit system, we cannot think a right of re-
covery can be grounded upon a loss caused by reason of the
performance of work required by the contract merely be-
cause a change in the plans of the work increased the number
of units of work of one class and decreased the number in
another; especially where, as in the present case, the city is
empowered by the contract to make "variations in the quan-
tity of the work to be done."    And this, we think, is the basis
of the appellants' claim.    They do not contend that the city

ordered or required them to perform any work not designated or contemplated by the contract, or that it did not pay them at the agreed price per unit for each unit of work actually performed. Their claim is that, notwithstanding they were required to bid, and did bid, on each class of units separately as if each class was an independent work, they submitted a bid below the actual cost of the work for one class of units and an excess bid on another class, expecting to recoup their losses on one class by their gains on the other, and suffered a loss because the city changed the plans of the work so as to increase the number of units of work in the one class and reduce the number in the other. It seems to us that if this rule is to prevail, the bid affords the city no protection. The city must either forbear making the desired changes, or else answer to the contractor in a manner different from that specified in the contract.

But there is another reason which we conclude forbids a judgment *non obstante veredicto* on this item of the appellants' claim. The specifications, it will be observed, expressly provide that "slopes of the reservoir basins are to be excavated to such a depth as will reduce them to plane surfaces," and that the "depth of this excavation will be determined by the city engineer during the progress of the work." Further, that the "excavated material shall be removed from the reservoir basins and deposited at such points as may be directed by the city engineer;" and that the "excavation as specified in the paragraph above, will be paid for at the rate bid therefor per cubic yard, measured in cut only, and the price so bid shall include the cost of making all excavations, loading into wagons, or other means of moving, hauling and dumping, and shall also include the labor of trimming the slopes and bottom of the reservoir basins to true form and grade, . . . and everything of whatever kind or nature necessary to secure the finished result;" and that "grades and lines will be given by the engineer in charge on hubs driven in the bottoms and slopes of the reservoir basins." Seemingly, under these pro-

visions of the stipulation, the contractors would have no right
to assume that the existing hubs and stakes, found on the
ground at the time of the calls for bids, marked the true sur-
faces of the slopes of the reservoirs, or that the protracted
measurements shown on the plans indicated their exact di-
mensions, but that they indicate rather that these surfaces
were subsequently to be defined, and might require a greater
or less amount of excavation than the hubs or the measure-
ments indicated.   Furthermore, no mention is made of refill-
ing in this connection; it being expressly provided that the
excavated material shall be removed from the reservoir basins.
Nor does the clause especially referring to refilling indicate
that the refilling of the gullies was contemplated.   It speaks
only of the refilling of spaces caused by the excavation of
"unsuitable materials" found in the reservoir basins; not to
existing gullies in the slopes caused by the erosions.    If,
therefore, the interpretation of the contract were a question
for the court, we think it could not be concluded that the ap-
pellants' interpretation was the true one.   On the other hand,
if the contract be of doubtful interpretation, the question was
properly submitted to the jury, and their verdict is conclu-
sive against a recovery if there was a substantial conflict in
the evidence, and the question was submitted under proper
instructions.   As to the evidence, we think there was a sub-
stantial conflict.   True, the conflict was between the experts.
But the question was one on which it was proper to take the
opinions of experts; and, clearly, where such evidence is
properly submitted to a jury, it is as much their province to
determine between the conflicting opinions as it is their
province to determine between other forms of disputed evi-
dence, and their verdict upon the one is as conclusive as it is
upon the other.

As to the instructions, it is not complained that those given
were erroneous, but it is claimed that the court erred in re-
fusing to give a requested instruction to the effect that the
city engineer did not have the right under the contract to

arbitrarily refuse to allow for extra work caused by changes in the plan of the work where such changes caused a loss to the contractor. But we think the court did so instruct in substance. It charged the jury, in effect, that if they found that a material change had been made in the character of the work, not contemplated by the contract, and such change had materially increased the cost of the work to the contractor to his damage, the contractor was not limited to the contract price, but could recover the increased cost of the work. This instruction was not elsewhere modified or limited, and we think it sufficiently informed the jury that the right of recovery was not barred by any arbitrary act of the city's engineer.

We have not overlooked the contention of the appellants to the effect that they took up the question of the proper construction of the contract with the office of the city engineer prior to bidding on the work, and were informed that they had not misinterpreted the specifications with reference to the excavation. Had it been shown that the contractors sought this explanation of the city engineer, the person named in the call for proposals as authorized to make explanations concerning doubts or obscurities in the plans of the work, it might be that the city would now be estopped from asserting that the setting back of the stakes thought to mark the surfaces of the slope of the reservoirs was not a material change in the plans of the work as contemplated by the contract. But we are unable to find that it was so shown, or that it was shown that the person consulted had authority to bind the city; at least, it was not shown with that degree of certainty as to remove the question from the domain of the jury and make it one of law for the court. Our conclusion is, therefore, that there can be no recovery on this branch of the case.

As we have before stated, the contract called for the grading and putting in of the sidewalks, curbs and gutters, on that part of the street which bordered the reservoirs on the

north. The bid for the work was on the unit basis, and there is not in the record sufficient data to show the estimated contract price of the finished work. The record does show, however, that the appellants sublet the work to another contractor at a price which would have yielded them a profit of $3,179. The city engineer eliminated this work entirely, refusing to permit it to be performed either by the subcontractors or by the appellants. The appellants claim that the engineer's action in this regard was wrongful and that they are entitled to recover, notwithstanding the verdict, a sum equal to the sum they would have made in profit had the subcontractors been permitted to perform the work. The city claims that it was permitted to eliminate the work under the conditions of a clause in the contract, called in the record the rubber stamp clause. This was a clause stamped on the margin of the contract with a rubber stamp, reading as follows: "The city engineer or board of public works shall have the right to diminish, increase or eliminate any of the items given in the approximate list of quantities furnished by the city engineer either before or after the commencement of the work. Such changes shall not constitute a claim for loss of anticipated profits."

The appellants contend that this clause of the contract permits only such changes in the work as may be necessary to overcome engineering difficulties unforeseen at the time the contract was entered into, and such minor and inconsequential changes as may be incidental to the complete execution of work; but does not permit radical changes in the contract such as will materially increase the cost of the work to the contractor or materially reduce his profits. This contention finds support in the authorities. Mr. Wait, in his work on Engineering and Architectural Jurisprudence, § 584, deduces from the authorities the following rule:

"Where a contractor's bids are unbalanced so that his profits come from one kind of work and not from another, the company cannot deprive him of his profits by increasing

the latter work and abandoning the former, if there be a departure from the plans upon which his bids were made."

*McMaster v. State,* 108 N. Y. 542, 15 N. E. 417, is a leading case upon the question. It there appears that the state of New York provided for the construction of a state asylum for the insane. The buildings were to consist of a central administration building, five male wards, five female wards, a laundry, two barns and an ice house. The plans provided that the exterior facings of the buildings should be constructed of brown sandstone. After the adoption of the plans, the state authorities in charge of the construction work advertised for bids for furnishing the necessary sandstone, and McMaster's assignors, being the lowest bidders, were awarded the contract. Subsequently, the state authorities called for bids for cutting the stone required to be furnished under the prior contract, and the same persons were awarded this contract. The latter contract contained the following provisions:

"The party of the second part [the state] reserves the right to make any change they shall deem proper in the plans and specifications of said buildings, and the work shall be performed by the party of the first part in accordance, for the prices and compensation above set forth, unless such change shall increase the expense of doing said work, in which case the party of the first part shall be paid a reasonable compensation therefor, to be certified by the supervising architect and superintendent."

Immediately after the execution of the last contract, the contractors entered upon the performance of the work, and continued to furnish and cut the stone thereunder until the administration building and two of the male wards were completed. At this stage of the proceedings the state made a change in the plans of the work. It resolved to build the remaining buildings of brick with sandstone trimmings only. The remaining male wards and the outbuildings were then completed according to the changed plans. The construction of the female wards was omitted entirely. The contract-

ors then made a claim against the state for damages on account of the breach of the contracts. The claim was disallowed because of the clause in the contract above quoted; the state contending that the clause, although included in one of the contracts only, was applicable to both. In an action to recover for the breach, the court held the particular clause inapplicable to either, on the ground that there was a material and substantial change in the contract, which the state could not make without the consent of the contractor. In its discussion of the question, the court, speaking of the change in the plans of the buildings, said:

"But if we should suppose that the rule could have operation and that this clause must be taken as controlling the construction of both contracts, as it certainly must be taken as controlling the construction of the contract in which it was inserted, yet we are of the opinion that it cannot have the effect claimed for it and that it did not authorize the change made. What change did the state reserve the right to make? It certainly had no right to omit entirely the construction of all or any of the buildings. The asylum buildings referred to in the contracts were the central or administration building, the five connecting wards on each side and the outbuildings. These were all to be built. The size and height of them were fixed and the material to be put in the walls was determined. The general character of the buildings could not be changed so that the buildings would not be the same contracted for; if it could be, then a public letting in such a case would not be a useful and might be an idle ceremony. Under such a reservation could a building planned for five stories be reduced to two? Could a stone building let to a stone mason be changed to wood or brick? Could the five connecting wards be reduced to two or three or four? We are clear that authority for such extensive changes could not be found in such language. If the state could change to brick walls with sandstone trimmings, then it could change to walls made wholly of brick, and thus there would be no stone to cut and the cutting contract would be entirely nullified. It is difficult, probably impossible, to draw in advance a precise line between what is authorized by such a reservation and what is not. It authorizes such changes as frequent-

ly occur in the process of constructing buildings, in matters of taste, arrangements and details; but it does not authorize a change in the general character of the building. If it does, a contract carefully entered into could be mainly if not entirely frustrated.

"The construction we have thus given is fortified rather than weakened by construing both contracts together, as the learned counsel for the state claims they should be. Under the first contract the contractors were required to own or purchase quarries and lease them or give the control of them to the state, and thus they were required to make considerable investments for the purpose of being able to furnish the stone. Can it be supposed, under such circumstances, that the parties intended by the reservation in the second contract to authorize at the will of the state any change that might substantially destroy the furnishing contract? Would buildings with a few superficial feet of sandstone facings be the building in reference to which the competitive bidding was invited and the contracts were let? We think not, and that the contracts were broken by change from sandstone to brick."

Speaking of the omitted work, it was further said:

"The largest portion of the award made to the claimant is founded upon the omission of the state to construct the five female wards. The refusal of the state to build them, and to allow the contractors to furnish and cut the stone for them constituted a breach of the contracts which made it liable for damages. . . .

"The state was bound by its contracts just as an individual would have been bound. It might violate them, but could not repudiate or destroy the obligation of them. It was bound through its legislature to make the necessary appropriation of money for them, and to do whatever was necessary for performance on its part. The contractors did not, in entering into the contracts, take the chances that the legislature would pass the acts requisite for performance on the part of the state; but they had the right to expect and demand performance on the part of the state as if it were an individual. Now what did the state do? After the central building, the five male wards and the out-buildings were completed, and while the contractors were there with their material ready to continue performance on their part, the managers representing

the state, by resolution, on the 5th day of November, 1877, ordered them to remove all their stone from the asylum grounds within ten days. The stone referred to, or at least some of them, may be presumed to have been delivered there for the performance of their contracts. The order was peremptory to remove *all* their stone, and thereafter they were not permitted to furnish or cut any more stone, and the five female wards have never been constructed, and the legislature has never appropriated any money for their construction. We think the contractors had the right to regard the contracts as broken as to the female wards, and they were not bound to make any offer or tender of performance. The resolution of the managers was equivalent to a positive command to cease further performance on their part. It is clear that an offer of performance on their part after that would have been fruitless, as the managers, without a legislative appropriation, were powerless to perform." *McMaster v. State,* 108 N. Y. 542, 15 N. E. 417.

Although not directly upon the point at issue, our own cases of *Atwood v. Smith,* 64 Wash. 470, 117 Pac. 393, and *Meacham v. Seattle,* 69 Wash. 238, 124 Pac. 1125, sustain the principle contended for by the appellants. In each of them it was held that, under a somewhat similar clause in a contract for a public work, the engineer in charge could not make such radical and material changes in the plans of the work as would result in material loss or damage to those participating in or affected by the performance of the contract. It is insisted on the part of the city that the right reserved in the present contract is stated with somewhat more strictness than is the right reserved in the contracts under consideration in the cases cited. This is undoubtedly true, but we think it the same in effect and governed by the same principles. Any other rule would permit the city to substitute another and entirely different work for that contemplated in the contract, thus frustrating the objects and purposes of contracts, and rendering inoperative the law requiring competitive bidding and the letting of contracts for public work to the lowest responsible bidder.

It is further insisted on the part of the city that the omission of this part of the work was not a radical or material change in the contract, when considered in connection with the work as a whole, but belongs rather to the class of immaterial and inconsequential changes, such as the city engineer had a right to make. The record before us, as we have before stated, does not show the estimated cost price of the entire work, nor does it show the actual sum paid the contractors on account thereof, although it can be gathered that the work was of considerable magnitude. But it would seem that however considerable the contract price of the work was as a whole, a change in the nature of an omission of a part of the contracted work, especially where the omitted work was ancillary to the main contract and not necessary to its successful completion, which caused a loss to the contractor of $3,179, could not be said to be immaterial or inconsequential. It is our opinion that it is a radical and material change such as the city had no right to cause to be made without rendering itself liable to the contractors for the loss it caused them.

But it is said that the question whether or not this change in the work was a material or immaterial change was submitted to the jury as a question of fact without objection on the part of the contractors or claim on their part that it should be determined as a question of law, and that, since the jury returned a verdict against them on the question, they are now estopped from claiming that they are entitled to a judgment for the omitted work as matter of law. But we think our holdings have been heretofore contrary to this contention. In *Roe v. Standard Furniture Co.*, 41 Wash. 546, 83 Pac. 1109, we said that "it is the proper practice for a trial court, upon the hearing of a motion for judgment *non obstante veredicto*, to enter final judgment in favor of either party where it is warranted by undisputed evidence." We held to the same effect in the subsequent cases of *Fishburne v. Robinson*, 49 Wash. 271, 95 Pac. 80, and *Spokane Grain Co. v. Great Northern Express Co.*, 55 Wash. 545,

104 Pac. 794, and discussed the limitations upon the practice in *Wagner v. Northern Life Ins. Co.*, 75 Wash. 106, 134 Pac. 685; *Brown v. Walla Walla*, 76 Wash. 670, 136 Pac. 1166; and *Auwarter v. Kroll*, 79 Wash. 179, 140 Pac. 326. It is true that in each of these cases, with the possible exception of the case of *Fishburne v. Robinson*, a motion for a directed verdict or a challenge to the sufficiency of the evidence had been interposed prior to the submission of the cause to the jury, but we cannot think the rule affected by this circumstance.

If a judgment *non obstante veredicto* may be entered at all by a trial court, no substantial reason exists why it should be preceded by a preliminary challenge. In many, if not in a majority of instances, it is the better practice for the trial court to take the verdict of the jury before sustaining a motion for nonsuit or challenge to the sufficiency of the evidence, as in such instances a new trial may be avoided should the appellate court on an appeal disagree with the trial court as to the effect of the evidence. It is our opinion, therefore, that a party is not precluded from seasonably interposing a motion for a judgment notwithstanding the verdict by suffering the case to go to the jury on the facts without interposing a motion for nonsuit, a motion for a directed verdict, or a challenge to the sufficiency of the evidence.

A third item is a claim for $425, loss in profits caused by the omission of the work of dressing the outer slopes of the reservoirs. This item was excluded after the contractors had expended some $200 in preparation for the work. The item itself, in view of the testimony on the part of the city regarding the feasibility of the work, would seem to belong to the immaterial and inconsequential class; at least we think it so far doubtful as to be a proper subject for the consideration of the jury, and we do not feel inclined to disturb their verdict thereon. But as the city did not make known its intention to omit the work until after the contractors had made expenditures looking towards its performance, we are of the

opinion that they are entitled to sums so expended, notwithstanding the verdict.

A fourth item is a claim for rivets, amounting to the sum of $110.50. The court withdrew this claim from the jury at the conclusion of the evidence, on the ground that it was not included in the claim of damages filed with the city. Counsel have discussed the question whether this is such a claim as is required to be presented to the city before an action can be instituted thereon, but we have found it unnecessary to determine the question. As we view the evidence submitted, there can in any event be no recovery for the item. The specifications relating to rivets provide:

"Rivet Iron: All rivet iron shall be of the best quality of double refined wrought iron, which, when broken, shall show a fine silken texture.

"It must show a tensile strength of not less than 50,000 pounds per square inch, an elastic limit of not less than 26,-000 pounds per square inch, a percentage of elongation in eight inches of at least eighteen (18%) per cent, and a reduction in area of not less than twenty-five (25%) per cent. Rivets must bend flat through 180 degrees upon themselves without showing signs of fracture upon the convex side, must be soft, tough and fibrous, and must flow well in riveting."

The rivets originally furnished, under the admission of the contractors themselves, did not comply with these specifications and were unsuitable for the purposes for which they were furnished. The claim in this court is, however, that they were rivets furnished under the direction of the city engineer, and, since they proved unsuitable, the city and not the contractors should bear the loss. But it is our opinion the evidence does not justify the claim that the engineer, or any person authorized to represent the city, selected the rivets in the first instance, but, on the contrary, that they were purchased by the contractors on their own responsibility from the company from whom they purchased the pipe on which the rivets were required to be used. This being true, the city, under the clause in the specifications relating to

rivets above quoted, had the absolute right to condemn them.

Our conclusion is that the contractors are entitled to recover on the second and third items mentioned in the sum of $3,317. The judgment is therefore reversed, and remanded with instruction to enter a judgment in favor of the contractors and against the city for that sum in addition to the amount awarded by the jury.

MORRIS, C. J., CROW, PARKER, and MOUNT, JJ., concur.