[No. 27367. *En Banc.* August 1, 1939.]

MARTIN SCHUEHLE, *Appellant,* v. THE CITY OF SEATTLE, *Respondent.*[1]

[1]Reported in 92 P. (2d) 1109.

*DuPuis & Ferguson* and *Geo. D. Lantz,* for appellant.

*A. C. Van Soelen, J. Ambler Newton,* and *John E. Sanders,* for respondent.

MILLARD, J.—On December 20, 1935, Martin Schuehle entered into a written contract with the city of Seattle, under the terms of which he was obligated to construct, according to certain plans and specifications, a reinforced concrete bridge, known as Schmitz park bridge, on Admiral way. Two hundred and seventy days were specified as the time for the completion of the work after notice to begin, which was given February 3, 1936, and completion was certified January 15, 1937. The two hundred and seventy days expired November 1, 1936, and an extension of time of forty-five days was then granted.

The contract divided the work into ten separate items, for each of which payment of an amount, lump sum or unit price, was specified in the contract as follows:

| Items | No. | Dollars | Cents | Unit |
|---|---|---|---|---|
| Engineering, 10,780.00 | .. | ..... | .. | .......... |
| Advertising, 250.00 | .. | 11,030 | 00 | .......... |
| Clearing and Grubbing | 1 | 3,800 | 00 | lump sum |
| Excavation | 2 | 2 | 00 | Per Cu. Yd. |
| Embankment | 3 | 1 | 00 | Per Cu. Yd. |
| Concrete, Class "B" | 4 | 21 | 00 | Per Cu. Yd. |
| Concrete, Class "D" | 5 | 18 | 00 | Per Cu. Yd. |
| Reinforcing Steel | 6 | | 05 | Per Pound |
| Copper Work | 7 | | 60 | Per Pound |
| Lighting System Complete | 8 | 1,200 | 00 | Lump Sum |
| Drainage System Complete | 9 | 650 | 00 | Lump Sum |
| Reinforced Concrete Pavement | 10 | 20 | 00 | Per Cu. Yd. |

Figured on a basis of quantity estimates made by the city engineer, the totals amounted to $116,038. The principal item was class B concrete, estimated at 2,236 cubic yards at $21 per yard, a total of $46,956.

Prior to the date of the execution of the contract, the city and the contractor agreed to change the plans and credit the city as follows:

Detour traffic, by removal of the bridge on the site and permitting the use of corbels, $1,000. This was done, and the contractor concedes credit to the city under the *quantum meruit* rule that, where a service is actually performed as provided in an abortive or ineffective contract, the price specified therefor constituted the reasonable value of the service. The agreement to eliminate the lighting system and credit the city in the amount of $1,200 was not carried out, as the city later required installation of that system. The city conceded that the contractor was entitled to credit for $1,200 plus $225 expense incurred by him in obtaining a new subcontract for that work.

The agreement to eliminate "the most expensive features of the railing and its supporting structure," amounting to $2,800, was not fulfilled according to the agreement, although changes were made in those features for which it appears the city endeavored to charge appellant $2,000, which is included in the final estimate as part of debit item of $3,033.80. That is, under the foregoing agreement, which is known as the "$5,000 agreement," the city endeavored to reduce the cost of the bridge and came to an agreement with the contractor as to the amount of credits the city should receive therefor in the event of the fulfillment of the agreement. On or about the time the contract was awarded, the city engineer made a report to the board of public works, in which he referred to the $5,000 agreement and stated that further changes were then contemplated by the city affecting the final bid quantities which would result in considerable savings to the city, and with no additional cost to it except for small alterations in form work.

The original plans for this construction work contemplated four street car tracks across the bridge and provided for the construction of slots to accommodate

the tracks. The board of public works did not approve until February 27, 1936, the proposed elimination of the street railway slots. This change effected considerable savings in the floor, main carrying frames, and footings, and, of course, involved redesign of those units, which had been under way since the date the contract was awarded. There is evidence to the effect that the contractor was not notified and knew nothing of the contemplated changes (those additional to the changes contemplated by the "$5,000 agreement") until subsequent to two changes—which he signed— pertaining to class D or footings concrete. The right of the city to credit on class D concrete is not questioned. The elimination of the street railway slots enabled the city to reduce the quantity of class B concrete by 129.49 cubic yards in the span of the bridge.

For clarity, we describe the bridge as consisting of the horizontal span, the perpendicular legs, and the earth-retaining wall system outside of the legs. All of these are class B concrete and are covered by item 4 of the contract. The footings of the legs are class D concrete and constitute a separate item (No. 5) of the contract.

The principal parts of the span are four ribs (hollow-box type with two side walls for each), the top slab, bottom slab, beams, diaphragms, and curbs, and the sidewalk, railing and support. The plans for the slabs, frame walls, beams, diaphragms, and curbs were changed by reduction, in most instances, of the thickness in varying amounts up to six out of fifteen and one-half inches in the top slab or thirty-nine per cent in quantity; three out of twelve inches in the curbs, one out of nine inches in the frame walls, except the two walls which form the outside of the bridge, which were first reduced and again changed, and as much as one out of six inches in other parts. The reduction

for the entire span as stated above amounted to 129.49 cubic yards of class B concrete or thirteen per cent of the yardage in the span. This is approximately seven per cent of all the concrete in the bridge and, under the testimony, is several times the usual or reasonable variation between the yardage specified in the plans and the actual yardage of the completed structure.

The evidence is to the effect that there was no reduction in the cost of falsework and forms for the changed parts which was included in the unit price of the class B concrete, and the average cost was not less than fourteen dollars per cubic yard for each of the 129.49 cubic yards eliminated by the changes, which, of course, amounted to a corresponding reduction in compensation or loss to the contractor. The changes resulted in an additional loss to the contractor of $1.00 per yard, the extra cost of placing steel and concrete, and working in the narrower spaces inside of the forms set closer together to make the parts thinner.

The change in plans necessitated changes in forms constructed according to the original plans prior to the changes. Changes were made in the forms at the shop, which changes resulted in expense and loss to the contractor. Other changes which were not of a major nature were made on the job to make previously constructed forms meet the changes in the plans. The contractor was paid for the cost of the latter changes. There were other changes in the class B concrete plans in relation to the earth-retaining wall system, changes in reinforcing steel were made, and there was a delay of a number of months in completion of the work, caused by conditions which resulted from class B concrete changes. Logically, that resulted in loss to the contractor of overhead and similar expense. The testimony as to that loss ranged from $883 to $1,250

a month. From the date the second change order— the two covered class D concrete—was signed by the contractor, the contractor objected to all changes that were made and refused to sign change orders except the two mentioned, claimed compensation for the value of the work done as changed, and presented his claims, in person and through attorneys, for the amount due him as a result of the increased costs to which he was subjected by reason of the changes in the plans.

The contractor brought this action against the city, not upon his contract, but in *quantum meruit* to recover the reasonable value of the labor performed and materials furnished in construction of the bridge. Plaintiff alleged substantial changes not within the contemplation of the parties were made by the city in the plans. That is, plaintiff's theory of his right to recover in *quantum meruit* was that substantial or material changes made in the plans by the city rendered the contract nugatory as a whole. Trial of the cause to the court resulted in findings of fact and conclusions of law in favor of the defendant. From judgment dismissing the action, plaintiff appealed.

Appellant contends that he is entitled to a recovery of $21,984.86, computed as follows:

Net deliveries of class B concrete 2,624.82 cubic yards the reasonable value of which as changed, $28.00 per cubic yard or $73,494.96. The city is credited with removal of the old bridge in the amount of $1,000 and payment to appellant for class B concrete on account in the amount of $50,510, or a total credit in favor of the city of $51,510.10.

It is clear from an examination of the record that minor or inconsequential changes in plans which are necessary for the practical performance of construction contracts are not the character of changes or deviations that were made by respondent. The changes

or deviations were material or substantial; they were not within the contemplation of appellant and respondent and were not covered by the contract. Compensation therefor to which appellant is entitled is based upon *quantum meruit* and not upon the contract.

"The question principally discussed by the appellants is the power of the city engineer to make the change in the slope of the cuts attempted to be made by him and according to which the appellants prosecuted the work. It is argued that the power was conferred on the engineer by that clause of the contract which empowers him to make such changes and alterations in the plans and specifications as the successful prosecution of the work may require. But we think it manifest that this clause of the contract cannot authorize such a radical change in the contract as was here attempted. No doubt under this provision the engineer could lawfully make such changes and alterations as were necessary to correct structural defects in the plans of the work or to overcome engineering difficulties arising from conditions not foreseen or known at the time the contract was entered into, or mayhaps correct minor and inconsequential omissions and mistakes therein, but the principle cannot be extended to cover a case such as the one now in question. The change attempted to be made was radical instead of minor and inconsequential. The necessity for it did not arise from any defect in the plan of the work or from engineering difficulties not foreseen at the time the contract was entered into. The change was made for the sole purpose of eliminating a large part of the cost of the work, and this was clearly not within the powers of the engineer." *Atwood v. Smith,* 64 Wash. 470, 117 Pac. 393.

In the case just cited, we held that a change in the slope of an excavation increasing the yardage and the cost constitutes a radical change. See, also, *McHugh v. Tacoma,* 76 Wash. 127, 135 Pac. 1011.

In *Kieburtz v. Seattle,* 84 Wash. 196, 146 Pac. 400, we held that lost profit in the amount of $3,179 which

resulted from the elimination of sidewalks around a reservoir was not a minor and inconsequential change and allowed recovery therefor regardless of the relatively small amount when compared to the magnitude of the work, which consisted of the construction of two reservoirs, installation of drains, putting in of sidewalks, etc.

In *Atwood v. Smith, supra,* from which we quoted above, means similar to those employed in the case at bar were there used in an effort to reduce cost of construction; and the case at bar is subject to the same condemnation as merited and received in the case cited.

In the case at bar, when the appellant commenced the construction of the bridge, the city decided that the plans and specifications called for the construction of a bridge which would cost more than the city desired to pay, and the city made changes in the plans. Those changes were made for the purpose of obtaining an advantage to the city which is not given in the contract; and those changes were radical. The facts bring the case at bar within the holding of *McHugh v. Tacoma,* 76 Wash. 127, 135 Pac. 1011. In the course of our opinion in that case, we employed the following language, which, with little paraphrasing, could be used in this opinion:

"When the appellant came to construct the line, the city decided that the plans and specifications called for the location of a line which would be disadvantageous to the city and made a change in the route. It was a radical change."

Changes of that character which cause substantial loss to the contractor entitle the contractor to recover in *quantum meruit. Atwood v. Smith, supra; Kieburtz v. Seattle, supra.*

The compensation of the appellant was reduced, it is clear from the facts which are recited above, with-

out any reduction in costs, and the amount of that reduction is the measure of the recovery to which the appellant is entitled.

There is no question of settlement, waiver, or estoppel before us. Appellant timely objected to the changes he was ordered to make. The evidence is clear that his objections were reiterated, and that notice of his refusal to perform the work as changed at the contract price and his demand for the reasonable value of that work were ample. In open court, counsel for respondent stated that the city had settled with the appellant, but there was no claim on the part of the city of an accord and satisfaction, as appellant had never signed a release; that the city did not claim that the appellant was foreclosed by reason of the fact that he agreed to take something in settlement of a larger amount.

The evidence is overwhelming that the respondent required the appellant to build substantially a different bridge than that on which the appellant bid and contemplated by the plans and specifications which were a part of the contract for the construction of that bridge. The radical changes in the construction required by respondent reduced the compensation of the appellant without any reduction in cost to him of the construction, and the amount of that reduction is the measure of the recovery to which the appellant is entitled; therefore, the judgment is reversed and the cause remanded, with direction to the trial court to enter judgment in consonance with the foregoing.

STEINERT, SIMPSON, ROBINSON, and JEFFERS, JJ., concur.

GERAGHTY, J. (dissenting)—I find myself unable to concur with the majority. I don't think the changes in the plans and quantities were so material or radical

as to alter the character of the work and justify the application of the *quantum meruit* rule, but, rather, such changes as it was contemplated might be made by the city within the following provision of the plans and specifications made a part of the contract by reference:

"CHANGES IN PLANS AND QUANTITIES. The City Engineer, under the direction of the Board of Public Works and upon its approval, reserves the right, by proper order in writing, to make changes in the plans for this improvement, to make variations in the quantity of the work to be done, and to eliminate any of the items of work at any time, either before the commencement or during the progress of the work, without thereby altering or invalidating any of the prices herein named. In case such action should diminish the amount of work, no claim shall be allowed for damages on the ground of loss of anticipated profits. Provided, that if such action should be taken after the commencement of any particular piece of work, and should thereby result in extra cost to the contractor, the City Engineer, with the approval of the Board of Public Works, shall make a fair and equitable estimate of the amount to be allowed therefor, which shall be accepted as final by both parties to such contract."

The city engineer certified, and the city paid, such allowances as were due the contractor by reason of the changes made in conformity with this provision.

It is a settled rule in this jurisdiction that, where a contract for public work makes, in explicit language, the decision of the engineer final as to the performance of the contract, such decision is conclusive upon the parties in the absence of fraud, arbitrary or capricious action, or mistake so gross as to imply bad faith.

*McKivor v. Savage*, 60 Wash. 135, 110 Pac. 811; *Hutchinson v. Spokane*, 72 Wash. 56, 129 Pac. 892; *Mallory v. Olympia*, 75 Wash. 245, 134 Pac. 914; *McGillivrae v. Bremerton*, 90 Wash. 394, 156 Pac. 23;

*State ex rel. Peterson v. Seattle,* 93 Wash. 593, 161 Pac. 478; *Baumgartner v. Renton,* 96 Wash. 588, 165 Pac. 484; *Coyle Const. Co. v. Skagit County,* 177 Wash. 520, 32 P. (2d) 106.

I am of the opinion that the judgment of the trial court was correct and should be affirmed.

BLAKE, C. J., MAIN, and BEALS, JJ., concur with GERAGHTY, J.

